# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2245
_____

United States of America,               *
                                         *
            Appellee,                    *
                                         *
v.                                       *
                                         *
Chante M. Hayes,                         *
                                         *
            Appellant.                   *


_____                              Appeals from the United States
                                         District Court for the
No. 08-2296                              Eastern District of Missouri.
_____

United States of America,               *
                                         *
            Appellee,                    *
                                         *
v.                                       *
                                         *
Gwendolyn Silvers,                       *
                                         *
            Appellant.                   *
                          _____

Submitted: January 14, 2009
Filed:  August 3, 2009
                          _____

Before LOKEN, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Chante M. Hayes ("Hayes") and Gwendolyn Silvers ("Silvers"), Hayes's aunt, were convicted by a jury of conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 371, 1035, 1347 and 2 and one count of making a false statement relating to health care matters in violation of 18 U.S.C. §§ 1035 and 2. In addition, Silvers was convicted of nine additional counts of making false statements relating to health care matters in violation of 18 U.S.C. §§ 1035 and 2; the jury found Hayes not guilty of these offenses. The district court sentenced Hayes to 51 months imprisonment on each count on which she was convicted, to be served concurrently, to be followed by 37 months supervised release. The district court also ordered Hayes to pay restitution in the amount of $545,713. The district court sentenced Silvers to 51 months imprisonment on each of the 13 counts on which she was convicted, to be served concurrently, followed by three years supervised release. The district court also imposed restitution of $545,713.

On appeal, Hayes contends that the district court erred by denying her: (1) motion to dismiss all counts of the superceding indictment, (2) Batson challenge,[1] (3) objection to the deliberate ignorance jury instruction, (4) motion for judgment of acquittal, and (5) challenges to sentencing enhancements for her role in the offense and abuse of trust. We reverse the district court's denial of Hayes's motion for acquittal on the false statement count and conclude that the district court clearly erred in imposing the abuse of trust enhancement. We reject Hayes's remaining contentions. Silvers asserts that the district court erred in: (1) denying her motion for

_____

[1]Batson v. Kentucky, 476 U.S. 79, 96-98 (1986) (providing a three-part analysis for determining whether a party impermissibly struck a potential juror on account of race).

judgment of acquittal, (2) its response to a question from the jury, and (3) determining the total amount of loss attributable to her. We determine that none of Silvers's arguments warrant reversal, and we affirm.

## I.

> The Medicaid program was established in 1965 by Title XIX of the Social Security Act ("the Act"), codified at 42 U.S.C. § 1396-1396v. The primary purpose of the program is to provide federal financial assistance to States that elect to reimburse certain costs of medical treatment for needy individuals. States voluntarily agree to participate in the program, but must comply with federal requirements once they do so.

Ahlborn v. Ark. Dept. of Human Servs., 397 F.3d 620, 623 (8th Cir. 2005) (citation omitted). "Missouri has elected to participate in the Medicaid program," In re Estates of Shuh, 248 S.W.3d 82, 84 (Mo. Ct. App. 2008), codifying its state program ("Missouri Medicaid") at Missouri Revised Statutes section 208.001 *et seq.* The State of Missouri administers the Missouri Medicaid program through the Division of Medical Services (DMS).[2] The Missouri Department of Health and Senior Services, Division of Senior and Disability Services ("DHSS") administers the Missouri Medicaid in-home services program. Mo. Code Regs. Ann. tit. 19, § 15-7.021. DHHS monitors the performance of in-home services providers to ensure that they are abiding by the Missouri Medicaid regulations. See id. § 15-7.010.

From the mid-1990s to the summer of 2005, Hayes and Silvers, along with other family members, worked for varying periods of time in three family-owned

---

[2]In the intervening time between the events giving rise to this case and this appeal, DMS underwent a name change to the MO HealthNet Division. See Mo. Rev. Stat. § 208.151.1; however, for purposes of this appeal, we will use the term "DMS" to refer to the agency that administers the Missouri Medicaid program.

health care agencies providing Missouri Medicaid in-home services: VIP Home Services ("VIP"),[3] Complete Care of America and International ("Complete Care"), and Watkins Loving Care Homes Services ("Watkins Loving Care"). From 1999 to about 2001, VIP and Complete Care were both operating. During 2002 and 2003, Complete Care and Watkins Love Care conducted business at the same time. Some clients were served by all three companies, and some employees worked for more than one of the companies. Missouri Medicaid reimbursed VIP, Complete Care, and Watkins Loving Care for in-home services that were purportedly provided to eligible elderly and disabled persons.

On January 12, 2006, a federal grand jury returned a 22-count superceding indictment against Hayes; Silvers; Jacqueline Hayes ("Jacqueline"), Hayes's mother; Sharon Johnson ("Johnson"), Silvers's sister; Earlean Hopson ("Earlean"), Silvers's aunt and Hayes's great aunt; Complete Care; and Watkins Loving Care. All of the defendants were charged with participating in a health care fraud conspiracy in violation of 18 U.S.C. §§ 371, 1035, 1347 and 2 ("count one"). They were also charged with 12 substantive counts of making a false statement relating to health care matters on various dates in violation of 18 U.S.C. §§ 1035 and 2 ("counts 2-13"). Only Jaqueline was named in counts 14-22. Jacqueline, Johnson, and Earlean entered into plea agreements with the government and pled guilty to count one; Jaqueline also pled guilty to counts 14-20.

Hayes and Silvers moved to dismiss all of the counts against them, counts 1-13, for lack of jurisdiction and failure to state an offense. The district court denied the motion. The case proceeded to trial as to Hayes and Silvers only. Jury selection took place on January 28, 2006. The district court denied defendants <u>Batson</u> challenge to

---

[3]Thelma Hayes-Jacobs, the mother of Silvers and a co-conspirator, started VIP in the mid-1990s and operated the company from her home in St. Louis County, Missouri.

the government's peremptory strike of venire person 22, a female African-American. The case proceeded to trial on January 29, 2006.

"We recite the facts in the light most favorable to the jury's verdicts." United States v. Engler, 521 F.3d 965, 968 (8th Cir. 2008). In 1999, Jacqueline started Complete Care. The Complete Care office was in Jacqueline's home and, for a time, in the Northland office building in St. Louis County. Jacqueline, Johnson, and Silvers prepared the proposal for Complete Care to DHSS. The proposal listed Jacqueline and Johnson as the owners of Complete Care and Hayes as the vice president. DHSS approved Complete Care's proposal to provide in-home services to clients. Two written provider agreements between DHSS and Complete Care were in effect from 1998 to June 30, 1999, and from July 1999 to June 30, 2000. Barbara Reuter, a quality assurance specialist with DHSS, testified that DHSS continued to deal with Complete Care as a provider of in-home health services until July 2005. (Trial Tr. vol. II, 94.)

In addition to owning Complete Care, Jaqueline served as a supervisor. Silvers was a supervisor at Complete Care and responsible for hiring and firing, training, handling employee and client files, working with nurses, and supervising staff. Complete Care documents also identify Silvers as "Administrator." Hayes was a supervisor at Complete Care and was responsible for receiving time sheets and billing. In addition to Jaqueline, Silvers, and Hayes, some of the other individuals that worked at Complete Care are as follows: Ruth White Buchanan ("Ruth"); Monica Silvers-Smith ("Monica"), Silvers's sister-in-law; Lawrence Hayes ("Lawrence"), Silvers's nephew and Hayes's cousin; Earlean; Thelma Hayes-Jacobs ("Thelma"), Silvers's mother; Mary Young ("Young"), a longtime friend of Jacqueline; Lynette Hopson-Bassette ("Lynette"), Silvers's cousin; Theresa Hayes-Kirkland ("Theresa"), Silvers's sister and Hayes's aunt; Sabrina Silvers ("Sabrina"), Silvers's daughter and Hayes's cousin; Annie Norman ("Norman"), the daughter of Jacqueline's ex-husband; and Anthony Johnson ("Anthony"), Johnson's husband. With the exception of Norman, the district court determined that all of these individuals were the defendants'

coconspirators, regardless of whether they were indicted or not, and the defendants do not challenge this ruling on appeal. (See Trial Tr. vol. VI, 200-01.) The coconspirators received immunity for their conduct related to this case in exchange for their cooperation.

Ruth began working at VIP in 1998. While working there, Ruth performed in-home health services for her husband, Silas Buchanan, even though she knew that state regulations prohibited a personal care aid from providing services to a spouse.[4] Thelma instructed Ruth to use her maiden name "White" on all paperwork that she turned into VIP and use her nondriver's identification bearing her maiden name. Silvers was present when Thelma told Ruth to use her maiden name, and Silvers instructed Ruth to use her maiden name on the time sheets that she completed for services to her husband. Ruth did so for a number of years.

Before Ruth went to work at Complete Care, Hayes brought a Complete Care application to Ruth's house and told her to fill it out exactly as she had her application at VIP. Ruth used her maiden name, "White," on the Complete Care application, time sheets, and other documents. She testified that she signed the name "White" on any document associated with Complete Care. Ruth turned in her time sheets at the Complete Care office on Northland to Hayes or whoever was in the office. Ruth stated that she signed and submitted the 44 time sheets in Exhibit 268A. Each time sheet reflected five days of services that she provided to her husband. Ruth again stated that she used the name "White" on the time sheets because she knew that Missouri Medicaid would not pay for services a wife rendered to her husband. See

---

[4]In-home service providers must "[e]nsure that no in-home services worker is a member of the immediate family of the client being served by that worker. An immediate family member is defined as a parent; sibling, child by blood, adopt, or marriage; spouse; grandparent or grandchild . . . ." Mo. Code Regs. Ann. tit. 19, § 15-7.021(18)(H). In addition, the Complete Care Code of Ethics provides that employees are not allowed to provide services to family members. (Trial Tr. vol. III, 32-33.)

Mo. Code Regs. Ann. tit. 19, § 15-7.021(18)(H). On occasion, Ruth mistakenly used her married name on time sheets. When this occurred, Silvers would tear up the time sheet, give Ruth another time sheet, and tell Ruth to use her maiden name. Silvers also asked Ruth to sign time sheets for clients, other than Silas Buchanan, but Ruth refused. Silvers told Ruth that she would find someone else to sign the time sheets.

Ruth was present at the Complete Care office in Jacqueline's home when DHSS conducted a monitoring visit. The monitors interviewed employees and reviewed documents, including personnel files. Jacqueline pulled Ruth to the side and told her to come into a bedroom. There, Jacqueline told Ruth to (1) tell the monitors that her name was "Ruth White" and (2) use an address other than her own. Hayes was present at Jacqueline's house when Jacqueline made these statements to Ruth, and Hayes was in the room when state monitors interviewed Ruth. Ruth complied with Jacqueline's instruction during her interview with the state monitors. Ruth also testified that she did not receive any training prior to providing services to her husband and did not receive the training reflected in Exhibit 268B, containing forms listing Silvers as Ruth's trainer/supervisor.

Monica testified that she initially worked at VIP. However, she did not complete an application and was paid in cash so that the various types of public assistance she received would not be terminated or reduced. Then, as VIP was going out of business and Monica was going to work at Watkins Loving Care, Silvers told Monica that she could no longer be paid in cash because, if they kept the practice up, VIP would be audited. Monica and Lawrence, at Thelma's suggestion and with Silvers and Earlean present, agreed that Monica would perform services for clients, check the boxes of services she performed for clients on time sheets, and then Lawrence would sign the time sheets. Lawrence picked up the paychecks for the time sheets he signed (for the work done by Monica) and split the money with Monica. Under this arrangement, Monica continued working without her public assistance benefits being reduced or terminated. It is unclear from the record which company

Monica was working for under this arrangement. She testified that the company she was working for "changed the name three times." (Trial Tr. vol. V, 157.) Thus, viewing the evidence in the light most favorable to the jury's verdicts, Engler, 521 F.3d at 968, Monica and Lawrence operated under this arrangement at Complete Care and Watkins Loving Care. After several months, the arrangement fell apart over a dispute as to the division of paychecks.

Lawrence corroborated Monica's account of their arrangement. Lawrence also testified that he did not actually perform any work at VIP, but he signed time sheets at Earlean's and Silvers's request. They discontinued the practice because, according to Lawrence, Silvers stated that he was getting paid too much money. When Silvers would not meet his price, Lawrence stopped signing the time sheets. Lawrence testified that he moved from one company to another and did not always know which company was operating out of different locations. Although he is listed as providing services to clients on 45 Complete Care time sheets in Exhibit 263A, 103 Complete Care time sheets in Exhibit 263B, 8 Complete Care time sheets in Exhibit 263C, and 40 Complete Care time sheets in Exhibit 263D, Lawrence testified that he did not sign the time sheets or provide services to the clients listed. Lawrence further testified that he did not sign any of the documents in his Complete Care employment application, identified as Exhibit 263F.

Earlean testified that she first worked at VIP and then, in August 2001, she began working at Complete Care. Earlean's advisors at Complete Care were Hayes and Jaqueline. Earlean stated that she did not receive any training at Complete Care; however, Silvers signed a document, dated August 11, 2001, as Earlean's trainer/supervisor that stated that Earlean had been provided training using a test client. Earlean also testified that she did not go through a skills test with a test client as provided in the "Training Waiver Justification" signed by Silvers as Earlean's supervisor.

Earlean identified Exhibits 261A, 261B, 261C, and 261D as containing time sheets for three clients for whom she had never provided services and 45 time sheets (about six months of services) for another client that she had served on only two occasions. The time sheets were initialed by Hayes as Earlean's supervisor. Earlean testified that Hayes had talked to Earlean about signing time sheets. Hayes told Earlean that she was the only one in the Complete Care office not signing blank time sheets which were later filled in to reflect services that the signatory had not performed and that Earlean needed to do so. In compliance with Hayes's instruction, Earlean began signing blank time sheets, and someone else completed them. In return, every pay period Hayes gave Earlean an envelope containing cash that was separate from her paycheck.

Earlean also testified that her daughter, Lynette, actually performed services for clients of Complete Care that Complete Care documents attributed to Earlean. This was done so that the Complete Care records would show Earlean receiving payment for those services, not Lynette. Earlean testified that this arrangement was a result of "[s]ome kind of . . . mixup with [Lynette's] Social Security numbers or something." (Trial Tr. vol. III, 58.) Earlean further testified that she knew about the arrangement between Lawrence and Monica because Earlean was at Thelma's (Earlean's sister's) house when it was discussed. Earlean stated that Silvers and Hayes discussed how much Lawrence was to be paid to sign time sheets for Monica.

Lynette testified that she worked at Complete Care. She used a false Social Security number and listed other false information in her employment application, including listing her father's address instead of her own. Lynette stated that she was married when she began working for Complete Care and that she provided services to her husband. Lynette testified that Hayes knew that Lynette was married. To conceal her marriage from DHSS, Lynette used her maiden name instead of her married name on her Complete Care application. Lynette testified that she knew, at the time, that Missouri Medicaid would not pay for services that she provided to her

husband. Lynette testified that she used her maiden name on the 53 time sheets in Exhibit 262A to conceal that she was providing services to her husband. Although Lynette's name appears on time sheets in Exhibit 262D, she testified that she did not know the client, had never gone to the client's home, and had not signed the time sheets. She also stated that she did not receive the required training as reflected in two pages of her Complete Care employment application; these forms identify Silvers as the trainer/supervisor. Lynette testified that she also worked for Watkins Loving Care. Although Lynette did not use a false Social Security number there, she and Johnson agreed that Lynette would provide services and Johnson would pay Lynette in cash so that Lynette's public assistance benefits would not be reduced or terminated.

Thelma testified that, after she closed VIP, she began working at Complete Care in 2001. She stated that Silvers served as her supervisor. Thelma identified several time sheets in Exhibit 272B, indicating that she had provided services for a certain client on multiple dates when, in fact, she had only provided services to that client on one occasion. She further testified that she provided services to the client identified in Exhibit 272C but did not do so for all of the dates listed on the time sheets.

Young testified that she began working for Complete Care in May 1999. Young stated that she did not provide the services reflected in the time sheets in Exhibit 283A. She also testified that she had not, in fact, signed some of the time sheets in Exhibits 283B and 283D that purported to contain her signature.

Theresa testified that she was employed at VIP from 1998 to 2001 as a certified nurse assistant (CNA). She stated that she transferred her clients to Complete Care when VIP closed. She also testified that she worked briefly at Watkins Loving Care. Theresa testified that she only signed 4 of the 46 time sheets in Exhibit 267C and that her signature is forged on the other 42 time sheets. Theresa stated that she did not know who had signed the sheets. Theresa testified that she turned time sheets into

-10-

Hayes. Theresa also stated that she never provided services to client Peaches Anderson although Theresa is listed as an aide on many time sheets with respect to Anderson.

Sabrina testified that she worked at VIP, Complete Care, and Watkins Loving Care. Sabrina stated that she had clients sign time sheets on a weekly basis and that the time sheets did not always reflect the time that she actually spent with the clients. Sabrina turned in her time sheets to Silvers. Sabrina also admitted that she never provided services to four of the clients identified in the time sheets in Exhibits 266B-266F. In addition, Sabrina stated that, while she worked at Complete Care, Jacqueline asked Sabrina to sign time sheets concerning services that she had not actually provided to the clients.

Norman testified that, although her name appears on numerous time sheets for Complete Care and Watkins Loving Care, she only worked one day in May 1999. She stated that she did not provide services to the clients identified on the 111 time sheets in Exhibit 276A, the 30 time sheets in Exhibit 276B, and the 45 time sheets in Exhibit 276C. Norman further testified that Jacqueline admitted to Norman that Jacqueline, herself, signed Norman's name on many time sheets.

Anthony testified that he worked for Complete Care and Watkins Loving Care. Anthony stated that he went to the home of a severely physically and mentally disabled child for a couple of hours but submitted a time sheet reflecting that he had been there for four hours. He received no training prior to providing services to this child. Anthony also signed time sheets for a second client to whom he had not provided all the hours of services reflected therein; these time sheets were already filled out, and he signed them. Anthony also signed time sheets for a third client, whom he had never met and for whom he provided no services. Earlean asked him to sign these time sheets, and he turned them in to her. Anthony testified that he knew

-11-

that a state agency was going to make payments based on what was reported on the time sheets.

Johnson testified that she and Jacqueline opened Watkins Loving Care in 2002. Johnson testified that she prepared the Watkins Loving Care proposal and submitted it. Watkins Loving Care and the Missouri Division of Medical Services executed a Title XIX participation agreement on April 19, 2002. Although Johnson testified that Jacqueline actually owned Watkins Loving Care, Jacqueline asked Johnson if Jacqueline could use a tax identification number that Johnson had obtained to open a day care center. Jacqueline agreed to pay Johnson $5,000 a month in exchange for the use of the number and Johnson signing documents related to Watkins Loving Care that called for the signature of the owner. Johnson's only function in relation to Watkins Loving Care between March and July 2002 was signing documents.

Johnson also testified that Earlean ran the Watkins Loving Care office. She stated that Watkins Loving Care had an account at First Community Credit Union in which Missouri Medicaid funds were deposited. Hayes, Earlean, and Silvers were the signatories on the account. Every payday, Johnson would ensure that there was sufficient money to make payroll, withdraw and retain $1,000, and give the remainder to Jacqueline. Jacqueline usually received $2,500 to $3,000 from Watkins Loving Care twice a month. Johnson stated that Silvers worked at Watkins Loving Care prior to July 2002 but left and returned to Complete Care when Johnson began working there in July 2002. Johnson did all of the billing for Watkins Loving Care after July 2002.

Johnson testified that Jacqueline asked Johnson to sign time sheets for services purportedly provided to Toni Phillips, a friend of Jacqueline's. Johnson stated that she went to Phillips's home for about an hour one time per week, but Johnson would complete time sheets and bill for four hours a day, five days a week. Watkins Loving Care received payments for these nonrendered services, and Phillips received a

portion of the Medicaid payment.  Johnson stated that sometimes she would give the cash payments directly to Phillips and other times Johnson would give the cash to Jacqueline to give to Phillips.  Johnson also testified that she did not provide the services to the clients identified in the eight time sheets in Exhibit 275A and the seven time sheets in Exhibit 275B.

Joan Robinson, a licensed registered nurse ("RN"), testified that she worked at VIP, Complete Care, and Watkins Loving Care.[5]  She stated that, regardless of what company she was working for, her duties remained the same and she saw the same patients.  Robinson visited clients' homes to assess and evaluate them.  Robinson completed the required forms to reflect her visits and assessments.  Robinson stated that, during the spring of 2002, Jacqueline called Robinson and told her that Jacqueline needed several nurse-visit reports that Robinson had not submitted. Jacqueline told Robinson that the state inspectors were at Jacqueline's home and suggested that Robinson bring the reports to a parking lot near Jacqueline's home. Robinson went to the parking lot and gave the nursing reports to Silvers.  Silvers asked Robinson if she would sign some additional nurse visit reports that Silvers had with her.  Robinson told Silvers that Robinson had not visited the clients.  Silvers told Robinson that Robinson could copy the reports in her own handwriting and sign the reports.  Robinson refused.  Robinson also testified that, with regard to the nursing reports in Exhibits 282D, 282E, 282F, and 282J which were submitted to DHSS, she had not visited the clients or performed the assessments reflected therein and that the reports contained her forged signature.

Yvette Phillips, Silvers's sister, testified that she never worked for Complete Care and had not lived in the St. Louis area since about 1993.  She testified, however,

---

[5]Per the Complete Care proposal and as required by Missouri administrative regulations, see Mo. Code Regs. Ann. tit. 19, § 15-7.021(12), Complete Care was required to employ a RN to supervise the RN visit program and to give on-the-job training to aides.

that she was listed as an aide on numerous Complete Care time sheets in Exhibits 270A-270E. She also stated that a Complete Care employment application in her name, Exhibit 270F, contained false information with respect to her residence and experience.

On February 5, 2008, the jury returned its verdict. The jury convicted Hayes on counts one and twelve and found her not guilty on the remaining eleven counts. The jury convicted Silvers on all counts. On May 28, 2008, the district court sentenced Hayes to 51 months of imprisonment to be followed by 37 months supervised release. The district court also ordered Hayes to pay $545,713 in restitution. On May 29, 2008, the district court sentenced Silvers to 51 months imprisonment on counts 1-13, to be served concurrently, and three years supervised release. Silvers was also ordered to pay $545,713 in restitution. Appellants bring this appeal.

## II.

We first address Hayes's arguments on appeal, that the district court erred by denying the: (1) motion to dismiss the superceding indictment, (2) Batson challenge, (3) objection to the deliberate ignorance jury instruction, (4) motion for judgment of acquittal, and (5) challenges to sentencing enhancements for her role in the offense and abuse of trust.

## A.

We review the district court's denial of Hayes's motion to dismiss the superceding indictment de novo. See United States v. Cvijanovich, 556 F.3d 857, 862 (8th Cir. 2009). Hayes asserts that in order for the superceding indictment to invoke the district court's jurisdiction and to state the offense of health care fraud conspiracy it must sufficiently allege the existence of provider agreements between Missouri

Medicaid and Complete Care because all allegations against her stem from her employment at Complete Care.[6]

We first consider the district court's jurisdiction. Under 18 U.S.C. § 3231, "[t]he district courts of the United States . . . have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." See also United States v. Cotton, 535 U.S. 625, 630-81 (2002) ("[A] district court 'has jurisdiction of all crimes cognizable under the authority of the United States' . . . ." (quoting Lamar v. United States, 240 U.S. 60, 65 (1916)). Pursuant to section 3231, federal district courts possess original jurisdiction over all violations of federal law. United States v. Watson, 1 F.3d 733, 734 (8th Cir. 1993) (per curiam). The superceding indictment charges Hayes with violating 18 U.S.C. §§ 371, 1035, 1347 and 2. Because the indictment sufficiently alleges violations of "laws of the United States," 18 U.S.C. § 3231, the district court had jurisdiction and correctly denied the motion to dismiss the superceding indictment on the ground that jurisdiction was lacking. See United States v. Trotter, 478 F.3d 918, 920 n.2 (8th Cir. 2007) (per curiam) (rejecting defendant's argument that the district court erred in failing to dismiss his indictment for lack of jurisdiction "[b]ecause [the defendant] was charged with an offense against the laws of the United States" such that "the court clearly had jurisdiction").

We next address whether the superceding indictment fails to state the offense of health care fraud conspiracy.

---

[6]Counts 2-13 of the indictment allege that Hayes made false statements to a health care benefit plan in violation of 18 U.S.C. §§ 1035 and 2. Although Hayes also asserts that counts 2-13 fail to state an offense, we do not address this contention as Hayes was acquitted on counts 2-11 and 13, and we vacate Hayes's conviction on count 12 on another ground. See infra Part II.D.

An indictment adequately states an offense if: it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted.

United States v. Sewell, 513 F.3d 820, 821 (8th Cir.) (quotation omitted), cert. denied, 128 S. Ct. 2517 (2008). Furthermore, "[a]n indictment is normally sufficient if its language tracks the statutory language." Id. (citing Hamling v. United States, 418 U.S. 87, 117 (1974)).

Count one charges that Hayes, along with Complete Care, Watkins Loving Care, Jacqueline, Johnson, Silvers, and Earlean, violated 18 U.S.C. § 371 by participating in a conspiracy to commit a crime against the United States by (1) defrauding a health care benefit program, see 18 U.S.C. § 1347, and (2) making false claims for health care benefit, see 18 U.S.C. § 1035. Section 371 provides, in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. The essential elements of a section 371 conspiracy crime are that: (1) the defendants agreed with another, (2) to commit crimes against the United States or violate the laws of the United States, and (3) at least one overt act was committed in furtherance of the agreement. See id.

-16-

The superceding indictment specifies that the conspiracy took place in or about 1999 to 2005 in the Eastern District of Missouri and elsewhere (Indictment 7) and provides that "[t]he purpose of the conspiracy was to obtain Medicaid reimbursement for in-home services that were not provided or were provided by unauthorized or unqualified persons" (id. at 8). The superceding indictment also lists several overt acts in furtherance of the conspiracy: that Jacqueline and Complete Care submitted an application to become a Medicare provider, numerous examples of time sheets submitted by Complete Care that falsely reflected dates and times of service to clients and falsely identified persons purportedly providing the services, and receipt of Medicaid funds for the false claims. (Id. at 9-11.) Because the superceding indictment tracks the language of the conspiracy statute, identifies the federal criminal laws that are the subjects of the conspiracy, alleges each of the essential elements of the crime of conspiracy, states the nature of the fraudulent scheme that was the subject of the conspiracy, specifies the approximate time period during which the conspiracy took place, states the place from which the scheme was allegedly operated, and specifies overt acts that furthered the conspiracy, the superceding indictment is sufficient as it pertains to the conspiracy charge. See Sewell, 513 F.3d at 821.

Hayes asserts, without authority, that the superceding indictment fails to invoke the district court's jurisdiction and to state the offense of health care fraud conspiracy because it does not contain sufficient allegations that a provider agreement existed between DHSS and Complete Care. None of the statutes that Hayes is charged with violating in the conspiracy count state that the existence of a provider agreement is a prerequisite for conviction or even mention a provider agreement. See 18 U.S.C. §§ 371, 1035, 1347. Thus, the statutes provide no support for Hayes's assertion that such an allegation is required in the superceding indictment in order to sufficiently invoke the district court's jurisdiction or state a health care fraud conspiracy offense in violation of the statutes listed in count one.

-17-

The Missouri Code of State Regulations requires that an in-home service provider have both a written provider agreement with Missouri Medicaid and that such an agreement is a prerequisite to obtaining reimbursement from Missouri Medicaid. (Indictment 6.) However, it is undisputed that, regardless of what Missouri regulations ordinarily require, Complete Care participated in the Missouri Medicaid program, sought reimbursement for in-home services purportedly provided to disabled and elderly residents, and Complete Care was reimbursed by Missouri Medicaid. This occurred whether or not Complete Care had a provider agreement with Missouri Medicaid. We reject Hayes's argument that, absent the existence of a provider agreement between Complete Care and DHSS, she was, essentially, free to make false statements to DHSS, receive an unlimited amount of money, and be immune from prosecution. Therefore, the lack of an allegation that a provider agreement existed between Complete Care and Missouri Medicaid at the time of Hayes's offenses does not render the superceding indictment insufficient in terms of jurisdiction or with respect to the stating of the offense of health care fraud conspiracy. Accordingly, the district court did not err in denying Hayes's motion to dismiss the superceding indictment.

B.

Hayes next contends that the district court erred in denying her <u>Batson</u> challenge to the government's peremptory strike of venire person 22, an African-American female, because the government's explanation for striking her was not supported by the record. We review the district court's <u>Batson</u> ruling for clear error, keeping in mind that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the party opposing the strike. <u>United States v. Bolden</u>, 545 F.3d 609, 614 (8th Cir. 2008).

> Courts evaluate <u>Batson</u> challenges under a three-step test. First, the defendant must make a prima facie case that the prosecution's strike was

motivated by race; second, the prosecution must offer a race-neutral reason for the strike; and third, taking into account all the evidence, the trial court must find whether or not the prosecutor was motivated by purposeful discrimination.

Kahle v. Leonard, 563 F.3d 736, 739 (8th Cir. 2009) (quotation omitted).

Here, Hayes raised a Batson challenge when the government struck venire person 22. The district court determined that Hayes had made a prima facie showing of a race-based strike. The court then shifted the burden to the government to provide a race-neutral reason for the strike. The government offered several reasons for striking venire person 22, one of which was that venire person 22 was the only panel member that responded to the question about whether they would insist on hearing from everyone involved in the case and indicated that she would prefer to do so before making a decision in the case.[7] The government explained that her response "tends to show that she would expect a high volume of proof, a high number of witnesses and comprehensive assessment by all witnesses which is, of course, not the government's burden . . . ." (Trial Tr. vol. I, 189-90.) Defense counsel responded, and, taking into account all of the evidence, the district court denied the Batson challenge.

Hayes asserts that the district court clearly erred because the government's proffered race-neutral reason was not supported by the record. However, the voire dire transcript provides that venire person 22 expressed concern about whether everyone with information concerning the case would testify.[8] Therefore, we

---

[7]We do not address the government's additional reasons.

[8]The transcript provides the following exchange between the prosecutor and venire person 22:

Q.    Well, if a case involves a number of people and you hear from some people but other people, for whatever reason, don't testify in the trial, is anybody going to be troubled by that just in and of itself, that I haven't heard from absolutely

-19-

conclude that the district court did not clearly err in denying Hayes's <u>Batson</u> challenge.

C.

Hayes also asserts that the district court abused its discretion in submitting a deliberate ignorance instruction[9] to the jury because the government only presented

---

everybody so I won't be able to render a verdict?

A.    I would be troubled but I was just, you know, you can't really decide if you don't have the evidence, but that's just [a] comment.

Q.    What was your comment?

A.    No. I was just saying that if–it makes it credible for whoever['s] side it is to get a chance to do everybody because you don't know, you know, who's more important, who knows what more and I think it's better to do everything.

(Trial Tr. vol. I, 74-75.)

[9]The district court's deliberate ignorance instruction was as follows:

Now members of the jury, you may find that defendant, Gwendolyn Silvers or Chante Hayes, acted knowingly. If you find beyond a reasonable doubt that the defendant, Gwendolyn Silvers or Chante Hayes, was aware of a high probability that statements submitted by them to Missouri Medicaid were false and that she submitted deliberately or, rather, that she deliberately avoided learning the truth. Now the element of knowledge may be inferred if a defendant, Gwendolyn Silvers or Chante Hayes, deliberately closed her eyes to what would otherwise have been obvious to her. You may not find that a defendant, Gwendolyn Silvers or Chante Hayes, acted knowingly. However, if you find that a defendant actually believed that the statements submitted by them to Missouri Medicaid were true, if you find that either Gwendolyn Silvers or Chante Hayes was simply careless, a showing of negligence

-20-

direct evidence that she had actual knowledge of the scheme and no evidence that she was deliberately ignorant of the scheme.[10] "We review the District Court's decision to give a jury instruction under the abuse-of-discretion standard. Our review of the District Court's decision to give [a deliberate ignorance] instruction must be done by viewing the evidence and any reasonable inference from that evidence in the light most favorable to the government." United States v. Woodward, 315 F.3d 1000, 1003-04 (8th Cir. 2003) (citation omitted). "While a district court should not give the deliberate-ignorance instruction when the evidence points solely to the defendant's actual knowledge of the facts in question, the instruction is particularly appropriate when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary." Id. at 1004 (quotation omitted); see also United States v. Whitehill, 532 F.3d 746, 751 (8th Cir.) ("A willful blindness instruction is not appropriate if the evidence implies [the defendant] could only have had either actual knowledge or no knowledge of the facts in question." (quotation omitted)), cert. denied, 129 S. Ct. 610 (2008).

---

or mistake or carelessness is not sufficient to support a finding of knowledge.

(Trial Tr. vol. VII, 97.)

[10]In denying Hayes's objection to the willful ignorance instruction, the district court stated,

I think there is substantial evidence that shows that Miss Silvers and Chante Hayes were in and out of various locations where allegedly fraudulent acts were ongoing. Whether or not they may have perpetrated the fraud individually I think is a question for the jury but I believe the fact that they were in and out while things were happening that were unlawful and fraudulent and ignored them could give rise to a jury to understand the purpose of this instruction, so I am going to overrule the objection . . . .

(Trial Tr. vol. VII, 10-11.)

At trial, Hayes denied any involvement with or knowledge of the health care fraud conspiracy of which she was charged. However, the government presented evidence to the contrary. For example, Earlean testified that, at one point, she had an exchange in the Complete Care office in which Hayes told Earlean that she was the only one in the office not signing time sheets, that they needed her to sign some time sheets for services that she had not provided, and that she did so. (Trial Tr. vol. 3, 53-54.) Earlean stated that often she simply signed blank time sheets that were completed by those at the Complete Care office. (Id. at 54.) Earlean testified that every pay period, in addition to her paycheck, Hayes paid Earlean cash for the time sheets that Earlean signed for services she had not performed. (Id. at 55-56.) As another example, Ruth testified that she completed her application for employment at Complete Care using her maiden name because Hayes, who gave Ruth the application at Ruth's home, instructed Ruth to complete the application exactly as she had at VIP. (Trial Tr. vol. V, 91-94.) In addition to the evidence of Hayes's direct knowledge of the health care fraud conspiracy, the evidence showed that she was a supervisor and office manager at Complete Care, she was responsible for billing and time sheets, and she initialed, as supervisor, hundreds of time sheets that reflected services that had not actually been performed. (Trial Tr. vol. III, 35-36, 39-40, 41-44, 47, 51-52.)

In sum, Hayes denied any involvement in or knowledge of the fraudulent scheme or the filing of false Medicaid claims in the face of strong evidence to the contrary. In addition to the evidence of her actual knowledge of the scheme, Hayes managed the Complete Care office and was responsible for submitting hundreds of fraudulent claims. Therefore, the evidence justified a deliberate indifference instruction, see Whitehill, 532 F.3d at 751; Woodward, 315 F.3d at 1003-04, and the district court did not abuse its discretion in so instructing the jury.

D.

Hayes next asserts that the district court erred in denying her motion for judgment of acquittal. Hayes raises the same arguments that we have already rejected in Section II. A. of this opinion, except that here she challenges her convictions based on the government's failure to prove the existence of a provider agreement between Complete Care and Missouri Medicaid at trial rather than the sufficiency of the superceding indictment. As we have already determined that the government's failure to allege the existence of such an agreement did not mar the superceding indictment, the same reasoning necessitates that we reject Hayes's contention. Thus, we conclude that the district court did not err in failing to grant Hayes's motion for judgment of acquittal on this basis. Furthermore, we note that Barbara Reuter, of DHSS, testified that two written provider agreements between DHSS and Complete Care were in effect from 1998 to June 30, 1999, and from July 1999 to June 30, 2000, and that DHSS continued to deal with Complete Care as a provider of in-home health services until July 2005. (Trial Tr. vol. II, 94.)

Hayes also argues that the government presented insufficient evidence for count 12 to go to the jury.

> We review de novo a district court's denial of a motion for judgment of acquittal. We view the evidence in the light most favorable to the Government and determine whether the evidence is sufficient to permit a reasonable jury to conclude that the defendant is guilty beyond a reasonable doubt.

United States v. Clarke, 564 F.3d 949, 954 (8th Cir. 2009) (quotation omitted).

Count 12 alleges that, in violation of 18 U.S.C. § 1035, Hayes and the other defendants, knowingly submitted a false statement in a matter involving a health care benefit program on or about August 11, 2001,

-23-

in that Defendant Gwen Silvers completed and signed a "Training Waiver Justification" form . . . that falsely and fraudulently stated and represented that Ruth Buchanan had completed 12 hours of training and had successfully completed a skills test on August 11, 2001 and have four hours of on the job training on August 21, 2001.

(Indictment 14-15.) Hayes does not dispute that the training waiver justification form is a false statement. Rather, Hayes contends that "[t]here was no evidence . . . that [she] was involved in or had any knowledge of this false statement with respect to the training waiver justification form." (Hayes's Br. 35.) In addition to section 1035, the crime was also charged under an aiding and abetting theory, see 18 U.S.C. § 2, and the district court submitted an aiding and abetting instruction to the jury, without objection from Hayes. Hayes could be convicted under an aiding-and-abetting theory if the government proved that she knew Silvers was falsifying the training waiver justification form and committed an affirmative act to further Silvers's offense. See 18 U.S.C. § 2(a); see also United States v. Mitchell, 388 F.3d 1139, 1143-44 (8th Cir. 2004) ("There are three essential elements of aiding and abetting: (1) the defendant associated herself with the unlawful venture; (2) the defendant participated in it as something she wished to bring about; and (3) the defendant sought by her actions to make it succeed.").

The specific false representation alleged in count 12, the training waiver justification form, is contained in Exhibit 268B, the Complete Care employee file for Ruth. Hayes and Silvers both signed off on forms included in Ruth's file. The only evidence as to the training waiver justification form, itself, was Ruth's testimony during the government's direct examination.

Q.    I asked you earlier about some training and you indicated that you didn't receive any training.

A.    Yes.

-24-

Q. Did you ever get tested on your ability to perform certain services?

A. No.

Q. Would you look at page 12, please. At the top of that page does it say "training waiver justification"?

A. Yes.

Q. And are you listed as the employee?

A. Yes.

Q. Will you come down to the section that says "12 hours additional," referring to the training.

A. Okay.

Q. You see the name of the Kenneth Hayes?

A. Yes.

Q. And it says "skills test." Did you ever have a skill test with Kenneth Hayes as the client?

A. No.

Q. Did you ever receive on-the-job training where someone observed your working with your husband, Silas Buchanan?

A. No.

Q. Whose name appears on the line that says "supervisor's signature"?

A. Gwendolyn Silvers.

Q.   And if you go to the next page, [which] refers to the same date, August 11 of 2001.  Do you see that?

A.   Yes.

Q.   The very top of that page.

A.   Yes.

Q.   And who is trainer/supervisor that's listed?

A.   Gwendolyn Silvers.

(Trial Tr. vol. V, 95-97.)

The government argues that the evidence was sufficient to permit a reasonable jury to conclude that Hayes was guilty of aiding and abetting Silvers's falsification of the training waiver justification form because the evidence demonstrated that Hayes, as supervisor and office manager, worked closely with all of the paperwork associated with Complete Care.  The government also points to the fact that Silvers signed off on the Ruth's training justification form, dated August 11, 2001, the same day Hayes traveled to Ruth's home to (1) have Ruth fill out the Complete Care employment application portion of the file and (2) instruct Ruth to complete the application as she had at VIP, i.e. to use her maiden name in order to hide that she was caring for her husband in violation of Medicaid regulations.

Despite the evidence of Hayes's involvement with the health care conspiracy at Complete Care and the fact that we must view the evidence in the light most favorable to the government, there was no evidence that Hayes knew Silvers was falsifying the training waiver justification form or that Hayes committed an affirmative act to further Silvers's offense.  Given the utter lack of evidence on either point, no rational juror could have found beyond a reasonable doubt that Hayes aided

and abetted the false statement. We therefore hold, as we must, that the district court erred in denying Hayes's motion for acquittal on the false statement charge.

E.

Hayes's final contention is that the district court committed procedural error by incorrectly calculating her advisory Guidelines range. See Gall v. United States, 552 U.S. 38, 128 S. Ct. 586, 597 (2007) (providing that we must ensure that the district court did not commit a significant procedural error, including improperly calculating the Guidelines range). She argues that the court clearly erred by increasing her offense level: (1) by two levels, pursuant to United States Sentencing Commission, Guidelines Manual, §3B1.1(c) (Nov. 2008), on the ground that she was a supervisor of criminal activity and (2) by two levels, pursuant to USSG §3B1.3, on the basis that she abused a position of trust in a manner that contributed to her offenses.

First, Hayes asserts that the district court clearly erred in applying the supervisor enhancement. "We review the district court's decision to assess a sentencing enhancement based upon a defendant's role in the offense for clear error . . . ." United States v. Guzman-Tlaseca, 546 F.3d 571, 579-80 (8th Cir. 2008) (quotation omitted), cert. denied, 129 S. Ct. 2025 (2009). USSG §3B1.1(c) provides that the sentencing court should increase the defendant's offense level by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving less than five participants. Hayes contends that there was insufficient evidence to support the enhancement because the record did not indicate that she had any decisionmaking authority at Complete Care. However, Earlean testified that Hayes was one of her supervisors at Complete Care and told her what to do and that Hayes was also responsible for billing. (Trial Tr. vol. III, 35.) Earlean also identified numerous time sheets with Hayes's initials as supervisor. (Id. at 39-40, 41-44, 47, 51-52.) In addition, Ruth identified a Complete Care document in which Hayes is titled "office manager." (Id. at 97.) Also, Hayes admits that she "did the

billing, worked with time sheets and made certain decisions about the business."
(Hayes's Br. 43.) Finally, Complete Care's proposal to Missouri Medicaid identified
Hayes as Complete Care's vice-president. (Trial Tr. vol. II, 50.) Thus, the district
court did not clearly err in applying the enhancement.

Second, Hayes contends that the district court erred in applying the abuse-of-
trust enhancement. Whether the defendant *may* occupy a position of trust is a question
of law; if so, whether she *did* is a question of fact. United States v. Baker, 200 F.3d
558, 563-64 (8th Cir. 2000). "We review the legal component of the abuse of trust
determination de novo and the district court's factual findings for clear error." United
States v. Anderson, 349 F.3d 568, 573 (8th Cir. 2003).[11] USSG §3B1.3 provides that
the sentencing court should increase the defendant's offense level by two levels "[i]f
the defendant abused a position of public or private trust, or used a special skill, in a
manner that significantly facilitated the commission or concealment of the offense .
. . ."

"Determining what constitutes a position of trust for the purposes of §3B1.3 is
not a simple task." United States v. Morris, 286 F.3d 1291, 1296 (11th Cir. 2002)
(quoting United States v. Iannone, 184 F.3d 214, 222 (3d Cir. 1999)).

---

[11]The government contends that we should review the district court's
application of the abuse of trust enhancement for plain error because Hayes's
objection to the enhancement at sentencing was premised on the proper standard of
proof. See United States v. Phelps, 536 F.3d 862, 865 (8th Cir. 2008), cert. denied,
129 S. Ct. 1390 (2009) ("If a defendant fails to timely object to a procedural
sentencing error, the error is forfeited and may only be reviewed for plain error.").
However, while Hayes characterized her standard of proof argument as her "main
objection," she also raised a sufficiency of the evidence objection. (Sentencing Tr.
14, 71.) The government responded to an evidentiary objection, and the district
court's explanation for imposing the objection demonstrates that Hayes sufficiently
raised the issue to avoid plain error review here. (Id. at 70, 72-73, 74-76.)

[T]he notion of "trust" embodied in the guideline is not the one contemplated by the ordinary dictionary concept of reliance or confidence for, in that sense, a bank trusts its tellers not to steal from the till. Rather, as used in the guideline, "position of public or private trust" is a term of art, appropriating some of the aspects of the legal concept of a trustee or fiduciary. The lesser degree of direct supervision exercised over fiduciaries or senior employees as opposed to cashiers, and hence the greater difficulty in detecting their transgressions, may explain part, but not all, of the distinction. . . . . Where an individual makes himself particularly vulnerable by entrusting another with substantial authority and discretion to act on his behalf and then relies upon and defers to that person, a decision to take advantage of that trust and vulnerability is particularly abhorrent, as it undermines faith in one's fellow man in a way that the ordinary pickpocket simply cannot.

United States v. Garrison, 133 F.3d 831, 839 n.18 (11th Cir. 1998) (quoting United States v. Ragland, 72 F.3d 500, 502-03 (6th Cir. 1996)).

Furthermore, "[b]ecause 'there is a component of misplaced trust inherent in the concept of fraud,' a sentencing court must be careful not to be 'overly broad' in imposing the enhancement for abuse of a position of trust . . . ." Id. at 838 (quoting United States v. Mullens, 65 F.3d 1560, 1567 (11th Cir. 1995); see also United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996) ("In every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply in every case of fraud."). Therefore, "for the abuse-of-trust adjustment to apply in the fraud context, there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario[.]" United States v. Williams, 527 F.3d 1235, 1250-51 (11th Cir. 2008).

Here, the primary victim of Hayes's fraudulent behavior is Medicaid, a governmental program. In United States v. Trice, 245 F.3d 1041 (8th Cir. 2001) (per curiam), this court determined that the district court erred in applying the abuse-of-

trust enhancement because "the victim of [the defendant's] offense, making a fraudulent statement, was the United States," and the defendant "was not in a position of trust vis-à-vis the United States . . . ." Id. at 1042. In Trice, the defendant, the president of a non-profit corporation formed to build a housing complex for handicapped individuals, pled guilty to making a fraudulent statement in violation of 18 U.S.C. § 1001, after falsely stating on a United States Department of Housing and Urban Development ("HUD") form that he had never been convicted of a felony. Id. The Trice Court explained that the abuse-of-trust enhancement did not apply because "the relationship between Trice and the United States was nothing more than an 'arm's-length business relationship.'" Id.; see United States v. Septon, 557 F.3d 934, 937 (8th Cir. 2009) ("[A]n arms-length commercial relationship will ordinarily not suffice for the [abuse-of-trust] enhancement to apply . . . ."); Baker, 200 F.3d at 563-64 ("[W]e agree with the Fourth Circuit that, as a matter of law, 'ordinary commercial relationships do not constitute a trust relationship sufficient to invoke the [abuse-of-trust] enhancement.'" (quoting United States v. Moore, 29 F.3d 175, 180 (4th Cir. 1994)).

Within the health care fraud context, the majority of our sister circuits that have addressed the question have held that health care providers who defraud Medicaid or Medicare may be subject to the abuse-of-trust enhancement. See United States v. Bolden, 325 F.3d 471, 478, 504-05 (4th Cir. 2003) (affirming the application of the abuse-of-trust enhancement because the defendant, the director of a nursing facility, occupied a position of trust with respect to Medicaid because "she possessed substantial discretionary authority[,] Medicaid entrusted [her] with thousands of dollars in prospective payments to [the nursing facility][] that were to be used for the benefit of its Medicaid beneficiaries[,] [a]nd her abuse of that authority contributed significantly to the commission and concealment of the fraud scheme"); United States v. Hoogenboom, 209 F.3d 665, 671 (7th Cir. 2000) (affirming the application of the abuse-of-trust enhancement to psychologist who falsely billed Medicare because "[m]edical service providers occupy positions of trust with respect to private or public

-30-

insurers (such as Medicare) within the meaning of guideline §3B1.3"); United States v. Gieger, 190 F.3d 661, 663, 665 (5th Cir. 1999) (affirming the application of the abuse-of-trust enhancement to owners of an ambulance transportation service provider convicted for conspiracy to submit false claims to Medicare because "the defendants carried out their fraud by abusing a . . . position of trust"); United States v. Wright, 160 F.3d 905, 910-11 (2d Cir. 1998) (affirming the application of the abuse-of-trust enhancement where the defendants had embezzled funds from a Medicaid-funded residence facility because public funds were entrusted to the facility for the benefit of its patients, and the defendants, through their positions at the facility, had embezzled the funds "without fear of timely detection by . . . the government, who entrusted them with the funds . . . for the well-being of the intended beneficiaries").

However, the Eleventh Circuit has determined that, as a matter of law, a Medicaid-funded health care provider does not occupy a position of trust vis-à-vis Medicaid. See United States v. Mills, 138 F.3d 928, 930, 941 (11th Cir.), modified on reh'g on other grounds, 152 F.3d 1324 (11th Cir. 1998) (concluding that the defendants, officers and majority shareholders of a Medicare services provider, were entitled to resentencing without the abuse-of-trust enhancement because a Medicare-funded care provider does not occupy a position of trust vis-à-vis Medicare); Garrison, 133 F.3d at 841-43 (remanding for resentencing, without abuse-of-trust enhancement, in part, because the defendant, the owner and chief executive officer of a home health care provider, "did not hold a direct or fiduciary-type position of public trust relative to the Medicare program, the victim" as "statutory reporting requirements do not create a position of trust relative to a victim of the crime").

In denying Hayes's objection to the abuse-of-trust enhancement, the district court stated:

> [T]he documents are replete with evidence that [Hayes] signed off on a great many of the documents involved that were submitted to Medicaid.

Medicaid relied on those documents. Hayes set herself out as one who was in a position to execute those documents by signing off on them either with her initials or by her signature and as a result of that and the other parts of the overall scheme in this matter, the jury found that this defendant was guilty of Count 1 of the indictment, the conspiracy to defraud Medicaid. . . . I think it is appropriate in this matter to add . . . the two levels under Section 3B1.3.

(Sentencing Tr. 74-76.) As to the legal component of the abuse-of-trust enhancement, we do not adopt the Eleventh Circuit's position. Rather, Hayes, as an employee of a Medicaid-funded home health care provider, *may* occupy a position of trust. See Baker, 200 F.3d at 564. Therefore, we must determine whether, "[a]s a matter of fact, the district court's finding that [Hayes] occupied a position of . . . trust in this case was . . . clearly erroneous." See id.

The government argues that facts support the district court's application of the abuse of trust enhancement because: (1) Hayes "was the person who turned false bills into government reimbursements," and (2) "the criminal scheme was allowed to continue and grow through the work of Defendant who ultimately chose to submit bills she knew to be false." (Gov't Br. 47.) However, the abuse of trust enhancement is not "so far reaching that it might cause virtually anyone who is commanded by statute to make an accurate report to the government to be subject to a Section 3B1.3 enhancement. All taxpayers who file false tax returns, for example, might be included." United States v. Broderson, 67 F.3d 452, 455 (2d Cir. 1995). Here, the district court's superficial reasoning does not demonstrate that Hayes and Medicaid's relationship was such that it went beyond the ordinary commercial relationship which is insufficient to invoke the abuse-of-trust enhancement. See Septon, 557 F.3d at 937; Trice, 245 F.3d at 1042; Baker, 200 F.3d at 564. Therefore, the district court clearly erred in applying the abuse-of-trust enhancement.

III.

We now address Silvers's arguments on appeal. She asserts that the district court erred in: (1) denying her motion for judgment of acquittal, (2) in its response to a question from the jury, and (3) determining the total amount of loss attributable to her.

A.

Silvers first argues that the district court erred in denying her motion for judgment of acquittal because the government failed to produce sufficient evidence to establish that she worked for any health care provider when her employer had a provider agreement with Missouri Medicaid. Silvers does not otherwise challenge the sufficiency of the evidence to sustain her convictions. Because Silvers's argument is the same contention we rejected with respect to Hayes, we hold that the district court did not err in denying her motion for judgment of acquittal.

B.

Silvers next asserts that the district court abused its discretion in its response to a question from the jury because the court referred the jury back to the original jury instructions instead of specifically answering the question or directing the jury to a specific jury instruction that did so. "A trial court's response to a jury's request for supplemental instruction is a matter within the sound discretion of the trial court, which we review for abuse of discretion." United States v. Hudspeth, 525 F.3d 667, 679 (8th Cir. 2008) (quotation omitted).

The <u>Hudspeth</u> Court stated, "The trial court must take great care to insure that any supplemental instructions are accurate, clear, neutral, and non-prejudicial, answering with concrete accuracy, and within the specific limits of the question presented." <u>Id.</u> (quotation omitted). After the jury had begun its deliberations, it sent a question to the district court, asking: "On Counts 2-11, are we to consider <u>only</u> Ruth White and Silas Buchanan as regards false statements?" (In Chambers Proceeding Tr. 3.) The district court suggested a response of: "you must be guided by the Court's instructions." (<u>Id.</u>) Silvers's counsel objected to the proposed answer, stating, in part: "This is a specific, intelligent question by the jury that has looked at this indictment. They want a definitive answer and I respectfully believe the Court ought to give them one. The answer is yes." (<u>Id.</u> at 4.) The district court overruled the objection, explaining:

> While it does appear they want a definitive answer, I am concerned about saying either yes or no. The statement, while it appears on reflection does request a specific answer, I am concerned that giving answers to specific questions of the jury could create problems in their entire deliberation on all of the counts . . . so I think the more broad statement that I have recommended is more appropriate in this matter.

(<u>Id.</u> at 4-5.) Silvers's counsel then requested that the court give the following answer: "other than the defendants[,] Ruth White and Silas Buchanan are the only two individuals named in Counts 2 through 11." (<u>Id.</u> at 5.) The court denied that request. (<u>Id.</u>) The court's response to the jury's question was: "you must be guided by the Court's instructions." (<u>Id.</u> at 3.)

"This court has recognized that, in responding to a jury's request for supplemental instruction, it may be proper at times to simply refer the jury back to the original instructions." <u>Hudspeth</u>, 525 F.3d at 679 (quotation omitted). Furthermore, Silvers's counsel conceded before the district court that the court "had already given a definitive answer to this jury on the [jury's] question . . . ," referring to the original

jury instructions which Silvers has not challenged on appeal. (In Chambers Proceeding Tr. 3.) In effect, counsel's statement demonstrates that the district court properly responded to the jury's question. In light of the accurate and thorough initial jury instructions given by the district court and counsel's concession that those instructions answered the jury's question, we find no abuse of discretion in the district court referring the jury back to such instructions.

C.

Finally, Silvers asserts that the district court committed procedural error by incorrectly calculating her advisory Guidelines range. See Gall, 128 S. Ct. at 597. She argues that the court clearly erred by increasing her offense level by 14 levels based on its finding that the amount of loss attributable to her was $545,713. See USSG §2B1.1(b)(1)(H) (increasing base offense level for fraud by 14 for a loss of more than $400,000 but less than $1,000,000).

Silvers asserts that the district court's loss calculation is incorrect because the court included loss arising before August 2001, and she is not liable for any losses prior to that date because the government did not offer any evidence of her involvement in either Complete Care or Watkins Loving Care before August 2001. Similarly, she contends that $56,885.26, the amount of the overpayment from the State of Missouri to Complete Care, should not be included because it accrued prior to August 2001. According to Silvers's loss calculation, $303,233.30 is attributable to her as loss. (See Silvers's Br. 25.) Thus, Silvers asserts that the district court should have imposed a 12-level enhancement pursuant to USSG §2B1.1(b)(1)(G) (increasing base offense level for fraud by 12 for a loss of more than $200,000 but less than $400,000), as opposed to the 14-level enhancement the court imposed under

USSG §2B1.1(b)(1)(H). "We review for clear error the district court's factual findings with respect to the time span of [Silvers's] involvement in the conspiracy and the resulting amount of loss attributable to [her]." United States v. Reeves, 83 F.3d 203, 207 (8th Cir. 1996).

At the sentencing hearing, the government's witness with regard to the amount of loss was Federal Bureau of Investigation Special Agent James Appelbaum, a specialist in the investigation of health care fraud for 15 years. (Sentencing Tr. 7-8.) Agent Appelbaum was the case agent in the prosecution of Silvers and her codefendants. (Id. at 8.) Agent Appelbaum identified Exhibit 322, which he had compiled, as a summary of Missouri Medicaid payments to Complete Care and Watkins Loving Care from March 5, 1999 to July 22, 2005, broken down by client. (Id. at 14-15; see Gov't Addendum 1-5.) According to Exhibit 322, the total paid by Missouri Medicaid to Complete Care and Watkins during this time period was $2,735,757.98. (Gov't Addendum 5.)

Agent Appelbaum then explained how the loss resulting from the health care fraud conspiracy of which Silvers was convicted was $545,731. (Sentencing Tr. 15-16). Agent Appelbaum explained that he: (1) "identified all the clients that had either received questionable services, had received no services, [or had received services from] aides [who] had not been trained properly and we identified about $1.7 million dollars," (id. at 15); (2) "refined that [amount] by going only to the clients where trial testimony was given about either that client or about individual time sheets [regarding that client] and we came up with a [new] total of . . . $977,665" (id.); (3) "took 50 percent of that total, basically giving the defendants the benefit of the doubt that some services had been provided and came up with §488,825, paid by Missouri Medicaid for those clients" (id.); and (4) "added in $56,885.26 which was the amount of [the overpayment to Complete Care by Missouri Medicaid] and when we added that to the $488,825, we got a total of $545,773 [a]s our estimated loss" (id. at 15-16). Agent Appelbaum further explained that the $56,000 overpayment could involve some

double counting and that was one of the reasons for the 50 percent reduction, which he stated more than offset any double counting that occurred. (Id. at 20.) Agent Appelbaum then went client by client, identifying the amount of the claim and why the claim was questionable and thus included in the amount of loss. (Id. at 16-19.)

The district court imposed a 14-level sentence enhancement after finding Silvers responsible for a loss of $545,713, see USSG §2B1.1(b)(1)(H); the court also ordered restitution in that amount. The district court stated, "I determine here that this defendant was involved in this jointly undertaken criminal activity and that all of the activities that were involved were foreseeable by her and that she is responsible for all of those acts." (Sentencing Tr. 37.); see USSG §1B1.3(a)(1)(A) (providing that relevant conduct for sentencing purposes includes "all acts and omissions committed, aided, abetted"); USSG §1B1.3(a)(1)(B) (providing that relevant conduct for sentencing purposes includes "all reasonably foreseeable acts of other persons taken in furtherance of the jointly undertaken criminal activity"). The district court concluded, "[T]he defendant in this case is responsible for all of those losses, particularly since they were halved to avoid any concern about a precise calculation." (Sentencing Tr. 38.)

We conclude that the district court properly "calculate[d] a reasonable estimate of the loss based upon a preponderance of the evidence." United States v. Boesen, 541 F.3d 838, 850 (8th Cir. 2008); see United States v. Piggie, 303 F.3d 923, 927 (8th Cir. 2002) (providing that "[t]he amount of loss need not be determined with precision") (quotation omitted)). In addition, although "[t]he conduct of others prior to the defendant joining the criminal activity does not constitute relevant conduct under the guidelines," United States v. Onwumere, 530 F.3d 651, 654 (8th Cir. 2008), here the government offered evidence that Silvers was involved in Complete Care prior to August 2001. Johnson testified that Silvers helped Johnson prepare the Complete Care proposal, which was dated July 15, 1999. (Trial Tr. vol. V, 168-69.) In sum, neither the district court's method of calculating the loss nor its inclusion of

loss resulting from the Complete Care health care fraud conspiracy before August 2001 was clear error. See Reeves, 83 F.3d at 207.

## IV.

For the foregoing reasons, we reverse the district court's denial of Hayes's motion for acquittal on count 12, the false statement count, and vacate Hayes's conviction and sentence on that count. We affirm Hayes's conviction on the conspiracy count. However, we determine that the district court clearly erred in applying the abuse-of-trust enhancement to Hayes's offense level and remand for resentencing on the conspiracy count without the enhancement. The judgment of the district court as to Hayes is, in all other respects, affirmed. We affirm Silvers's convictions and sentence.

_____