# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3620

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Paul David Anderson, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: September 9, 2003

Filed: November 14, 2003

_____

Before LOKEN, Chief Judge, McMILLIAN and HANSEN, Circuit Judges.

_____

LOKEN, Chief Judge.

A jury found Paul David Anderson guilty of forty-nine counts of mail fraud, money laundering, and engaging in transactions with property derived from unlawful activity. See 18 U.S.C. §§ 1341, 1956(a)(1)(A), and 1957. He appeals his 108-month sentence, arguing that the district court erred by increasing his sentence offense level for use of sophisticated means, exploiting a large number of vulnerable victims, and abuse of a position of private trust. The parties agree that these issues are governed by the Sentencing Guidelines in effect on November 1, 1998. We remand for further consideration of the vulnerable victims increases and otherwise affirm.

## I. Use of Sophisticated Means.

The applicable fraud guideline provided for a two-level increase to the base offense level if "the offense otherwise involved sophisticated means." U.S.S.G. § 2F1.1(b)(5)(C) (1998). The guideline commentary defined sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," and explained that this enhancement "requires conduct that is significantly more complex or intricate than the conduct that [warrants] an enhancement for more than minimal planning." § 2F1.1, comment. (n.15) (1998). "We review the factual finding of whether a [fraud] scheme qualifies as 'sophisticated' for clear error." United States v. Brooks, 174 F.3d 950, 958 (8th Cir. 1999).[1] Anderson concedes that his conduct warranted a more-than-minimal-planning enhancement but argues that the district court clearly erred in imposing the increase for use of sophisticated means. We disagree.

Anderson was a former insurance salesman who induced his fraud victims to invest more than one million dollars in what he called "private tender offers" in his

---

[1]We also reviewed sophisticated means enhancements for clear error in two unpublished decisions, United States v. Kane, 56 Fed. Appx. 297, 297 (8th Cir. 2003), and United States v. Cantrell, 48 F.3d 1225, 1995 WL 110358 (8th Cir. 1995) (table). However, a panel recently departed from this standard and conducted de novo review of "whether the district court correctly applied the guidelines when it determined those facts constitute sophisticated means." United States v. Hart, 324 F.3d 575, 579 (8th Cir. 2003). In our view, Brooks stated the correct standard of review for three reasons. First, "[w]hether the scheme was 'sophisticated' or not is essentially a question of fact." United States v. Hunt, 25 F.3d 1092, 1097 (D.C. Cir. 1994); accord United States v. Rettenberger, 344 F.3d 702, 709 (7th Cir. 2003). Second, clear-error review is more consistent with the applicable statute, which provides that a court of appeals "shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). Third, clear-error review also applies to the related question whether an offense involved more than minimal planning. See United States v. Wells, 127 F.3d 739, 750 (8th Cir. 1997).

company, The Premier Group. Anderson represented that these investments were risk-free and tax-free, and he guaranteed a twelve percent annual return. Anderson then commingled the investors' funds and invested a substantial portion in World Network Holdings, an undisclosed company controlled by Harry Plott, a secretive Florida resident who appealed to investors wishing to avoid government regulation and taxation through off-shore activities. After numerous confusing transactions, World Network Holdings morphed into Mali-Suisse Mining International Ltd., which issued "registered discounted accumulating debenture bonds" to replace investors' vanished stakes in World Network Holdings.

Anderson clearly defrauded his victims by diverting nearly two-thirds of their investments to his personal use, investing the remainder in the undisclosed and highly risky World Network Holdings, and using the commingled funds of later investors to pay interest to earlier investors. Anderson argues this was merely a simple Ponzi scheme. The government points to the complex off-shore activities of Harry Plott and his associates and argues they are attributable to Anderson and demonstrate the use of sophisticated means. Anderson responds that he was an unknowing victim of Plott's intricate frauds, losing his own funds as well as those of his clients.

The district court did not make an explicit finding as to Anderson's knowledge of Plott's frauds. We conclude one is not needed to impose the sophisticated means enhancement. The trial record is replete with evidence that, when Anderson became convinced that his investments with Plott's entities might be worthless, Anderson advised his victims that their Premier Group investments would be replaced with Mali-Suisse bonds *if* they signed a release absolving Anderson of all liability. The victims were told that Mali-Suisse was organized under the laws of Anguilla, that its principal place of business was in London, England, and that the bonds would mature in four years and were guaranteed by First Mercantile Bank, Ltd., a Swiss bank chartered in Grenada, West Indies. These tactics helped conceal Anderson's fraud because, before finally contacting the authorities, many victims asked attorneys,

financial advisors, and accountants for help in determining the value of the worthless Mali-Suisse bonds. Thus, whether or not a "simple" Ponzi scheme would amount to the use of sophisticated means -- an issue we do not address -- the district court's finding that Anderson used sophisticated means to conceal his more elaborate mail fraud is not clearly erroneous.

## II. Exploiting Vulnerable Victims.

Anderson's appeal of the vulnerable victim increases poses far more difficult issues. The 1998 guidelines provided for a two-level enhancement if the defendant "knew or should have known that a victim of the offense was a vulnerable victim," and for an additional two-level enhancement if "the offense involved a large number of vulnerable victims." U.S.S.G. § 3A1.1(b)(1) and (2) (1998). Section 3A1.1(b)(1) applied if the defendant knew or should have known that his victims were "unusually vulnerable due to age, physical or mental condition, or [were] otherwise particularly susceptible to the criminal conduct." § 3A1.1, comment. (n.2) (1998). We review vulnerable victim determinations for clear error. United States v. Boult, 905 F.2d 1137, 1138-39 (8th Cir. 1990).

Anderson's Presentence Report (PSR) recommended that both enhancements be imposed. After briefly summarizing each victim's investments, the PSR stated:

> **Victim-Related Adjustments:** Anderson's scheme included convincing elderly victims to invest their life savings with the Premier Group. Many of the victims were in excess of 70 years of age, had little or no knowledge of the complexities of investing, and many had limited education. Therefore, the Probation Office believes that Anderson specifically chose these individuals because of their age, and they were particularly susceptible to the criminal conduct because of their lack of investment knowledge and minimal education. He knew or should have known that this made them unusually vulnerable to these types of financial schemes. Pursuant to 3A1.1, two levels are added.

-4-

Because the offense involved at least eighteen vulnerable victims, a two-level increase, for a large number of vulnerable victims, pursuant to 3[A]1.1(b)(2)(A) and (B), is required.

Anderson objected to this recommendation, arguing that age by itself was an insufficient basis for the vulnerable victim finding. At sentencing, the district court stated: "Having presided over the trial in this case and heard the evidence, I hereby make the factual findings implicit in my decision to overrule those objections."

On appeal, Anderson argues that a vulnerable victim enhancement should not be upheld absent a finding of "particularized vulnerability." Our early decisions applying § 3A1.1 support this contention, repeatedly stating that "unless the criminal act is directed against the young, the aged, the handicapped, or unless the victim is chosen because of some unusual personal vulnerability, § 3A1.1 cannot be employed." United States v. Paige, 923 F.2d 112, 113 (8th Cir. 1991) (quotation omitted); see United States v. Ravoy, 994 F.2d 1332, 1335 (8th Cir. 1993); United States v. Cree, 915 F.2d 352, 354 (8th Cir. 1990). The inquiry, we explained in these decisions, was to determine whether the defendant's choice of victims "show[s] the extra measure of criminal depravity which section 3A1.1 intends to punish more severely." Paige, 923 F.2d at 113-14.

The focus of § 3A1.1(b) changed somewhat when Congress, reacting to telemarketing fraud aimed at elderly victims, directed the Sentencing Commission to review whether the guidelines adequately protected elderly victims of fraud.[2] In

---

[2]See Violent Crime Control & Law Enforcement Act of 1994 § 250003, Pub. L. No. 103-322, 108 Stat. 1796, 2085-86 (1994). Congress issued a second directive on this subject in § 6(c)(3) of Pub. L. No. 105-184, 112 Stat. 520, 521 (1998), which prompted the Commission to add the additional enhancement for a large number of vulnerable victims in § 3A1.1(b)(2). See U.S.S.G. App. C, Amendment 587 (Nov. 1, 1998).

response, the Commission amended § 3A1.1 in 1995 to eliminate the commentary that the § 3A1.1(b) enhancement applies only when "an unusually vulnerable victim is made a target of criminal activity." See U.S.S.G. App. C, Amendment 521 (Nov. 1, 1995). We then concluded that this amendment "eliminates the targeting requirement, merely requiring a showing that the defendant knew or should have known of the victim's unusual vulnerability." United States v. Hogan, 121 F.3d 370, 372 (8th Cir. 1997). But to apply the amended guideline, the sentencing court must still determine whether a victim was, in the words of application note 2, "unusually vulnerable due to age" or some other characteristic. In other words, the enhancement still requires a fact-based explanation of why advanced age or some other characteristic made one or more victims "unusually vulnerable" to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability. See generally United States v. Castellanos, 81 F.3d 108, 110-12 (9th Cir. 1996).

When a vigorous young defendant inflicts a crime of violence on an elderly person, the defendant's knowledge that the victim was unusually vulnerable to this crime due to age is often obvious for purposes of clear error review. See, e.g., United States v. Williams, 258 F.3d 669, 673 (7th Cir.), cert. denied, 534 U.S. 981 (2001). But when older persons are victims of fraud crimes, the issue is much less clear. As a group, older persons are more experienced investors, so it would be clear error to impose a § 3A1.1(b)(1) increase simply because some of the victims of a widespread investment scam were elderly. On the other hand, when a telemarketing scam is aimed at the elderly because they are believed to be lonely and susceptible, a § 3A1.1(b)(1) increase is obviously appropriate. See United States v. Washington, 255 F.3d 483, 486 (8th Cir. 2001); United States v. Whatley, 133 F.3d 601, 607 (8th Cir.), cert. denied, 524 U.S. 940 and 524 U.S. 945 (1998). In this regard, evidence of targeting, while no longer required, may provide powerful proof of both the victim's unusual vulnerability and the defendant's knowledge of that vulnerability.

In this case, a number of victims testified at the lengthy trial. The government's brief provides no detailed analysis of why this evidence established that Anderson knew or should have known that *any* victim was unusually vulnerable to this investment fraud due to age or any other factor.[3] The PSR recites that eighteen elderly victims were vulnerable due to age and other reasons. Though not evidence, a PSR's thorough explanation may be sufficient support for a district court's cryptic reliance on the trial record. See United States v. Baker, 200 F.3d 558, 563 (8th Cir. 2000). But here, the PSR's explanation is general, not thorough, and our review of the trial record suggests that at least some of these elderly victims were clearly not "unusually vulnerable" due to age.[4] On this record, the district court's statement that, having heard the trial evidence, "I hereby make the factual findings implicit in my decision," does not give us an adequate basis to review the court's application of § 3A1.1(b)(1). See United States v. Randolph, 101 F.3d 607, 609 (8th Cir. 1996). The case is therefore remanded for resentencing on this issue, and on the related issue whether "the offense involved a large number of vulnerable victims" within the meaning of § 3A1.1(b)(2), a rather new Guideline that is largely uninterpreted. Compare United States v. Mooty, 25 Fed. App'x 501, 501 (8th Cir. 2002) (unpublished) ("[W]e hold that seven is not, as a matter of law, a 'large number' within the meaning of section 3A1.1(b)(2)."). We express no view on the merits of these issues.

---

[3]Instead, the government simply asserts that "the instant scheme featuring the too good to be true, tax free, risk free, 12% rate of return investment, would have little chance of success without such a vulnerable audience." This breezy assertion, made without careful analysis of the facts or of our § 3A1.1 precedents, is contrary to the Guidelines and falls far short of the necessary showing.

[4]For example, victim Chester Hoefner was a 73-year-old dairy farmer who purchased a family trust from Anderson in 1994. In 1998, Hoefner cashed in conservative investments to invest in Premier Group private tender offers. Hoefner explained: "Zero risk. That's what I understood, otherwise I would have never invested in it."

### III. Abuse of a Position of Private Trust.

Anderson next appeals his two-level upward adjustment for abusing a position of private trust. See U.S.S.G. § 3B1.3 (1998). The 1998 guideline commentary explained that a position of private trust is "characterized by professional or managerial discretion" and gave as an example a defendant who "perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker." § 3B1.3, comment. (n. 1 and 2). We review the legal component of the abuse of trust determination de novo and the district court's factual findings for clear error. See Baker, 200 F.3d at 563-64.

Anderson argues that he had "ordinary commercial relationships" with his victims and that such relationships do not qualify for the enhancement. In Baker, we agreed that "ordinary commercial relationships" do not have the requisite component of trust, but we held that "a licensed insurance agent with control over client funds *may* occupy a position of private trust," and we found no clear error in the district court's finding that the defendant occupied a position of trust with her clients. 200 F.3d at 564. Baker is controlling here. Anderson first sold many of his victims annuities offered by insurance companies and living or family trusts, transactions that acquainted him with their investable assets. He then persuaded these clients to exchange the annuities and other investments for "private tender offers" in The Premier Group. These fraudulent investments gave him complete discretion over client funds. He commingled those funds, which facilitated both the commission and the concealment of his fraud offenses. See § 3B1.3, comment. (n.1). In these circumstances, the district court did not commit clear error in imposing the abuse-of-trust enhancement.

The judgment of the district court is affirmed.

_____