# United States Court of Appeals

### For the Eighth Circuit

_____

No. 22-1106

_____

United States of America

*Plaintiff - Appellee*

v.

Arondo Harris

*Defendant - Appellant*

_____

No. 22-2368

_____

United States of America

*Plaintiff - Appellee*

v.

Arondo Harris

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: February 17, 2023
Filed: October 11, 2023

_____

Before SMITH, Chief Judge, STRAS and KOBES, Circuit Judges.

_____

STRAS, Circuit Judge.

Arondo Harris used fake deeds to gain possession of three houses. He now asks us to overturn his identity-theft convictions and vacate his 41-month sentence. We affirm in part, reverse in part, and remand for resentencing.

I.

Harris searched for rundown properties in the St. Louis area to buy for just a few thousand dollars and renovate for a profit. If he could convince the owners to sell, the next step was to prepare a quitclaim deed for both parties to sign in front of a notary. The final step was to record the deed at City Hall. At that point, he owned the property.

His standard practice changed, however, when he met "J.T." Carrothers. Purporting to act as a middleman for the owners of three properties, Carrothers provided notarized deeds with each of the necessary signatures—including Harris's own—already in place. Despite the red flags, Harris recorded the deeds as usual and began renovating the houses.

When the owner of one of the houses found out what Carrothers and Harris had done, she called the police. After discovering that the scheme involved two other properties, federal prosecutors charged Harris with six counts of identity theft. *See* 18 U.S.C. § 1028(a)(7).

His defense was that *he* was the real victim of the scheme. He claimed that he was unaware that the deeds were fake, which meant that he could not have "knowingly transfer[red], possess[ed], or use[d]" the false signatures and notary seals to carry out an "unlawful activity." *Id.*

-2-

Harris wanted Carrothers to testify, but no one could locate him before trial. After the jury returned a guilty verdict, Harris fired trial counsel, hired someone new, and argued that counsel had been ineffective. The district court disagreed and concluded that, in any event, having Carrothers testify would not have made a difference.

Sentencing went just as poorly for Harris. He received a 41-month sentence, based in part on a finding that the victims of the scheme had lost $153,000—much higher than the estimate provided by his own expert—based on Realtor.com's then-current estimated value of the three properties. *See* U.S.S.G. § 2B1.1(b)(1)(F) (applying a 10-level increase when the loss is between $150,000 and $250,000). On appeal, Harris challenges the loss calculation but begins by disputing the sufficiency of the evidence underlying his identity-theft convictions.

## II.

For the convictions to stand, Harris's use of the false signatures and seals must have "affect[ed] interstate . . . commerce." 18 U.S.C. § 1028(c)(3)(A). In his view, the government did not prove it did. We review the sufficiency of the evidence de novo, viewing the record in the light most favorable to the verdict. *See United States v. Aungie*, 4 F.4th 638, 643 (8th Cir. 2021).

Harris's argument is that these transactions could not have affected interstate commerce because no money or property crossed state lines. These days, however, it does not take much for a criminal act to "affect[] interstate . . . commerce." 18 U.S.C. § 1028(c)(3)(A). Any "actual" impact, no matter how minor, will do. *United States v. Koech*, 992 F.3d 686, 692 (8th Cir. 2021); *accord United States v. Mann*, 701 F.3d 274, 294–95 (8th Cir. 2012).

Harris's actions affected interstate commerce in at least two ways. First, he admitted that he used Facetime and text messaging to communicate with Carrothers about the deeds. As we have explained, "the use of phones, text messages, and [the]

internet . . . is evidence of the requisite effect on interstate commerce." *Koech*, 992 F.3d at 693. They are, after all, "instrumentalities" of interstate commerce. *United States v. Corum*, 362 F.3d 489, 493–94 (8th Cir. 2004) (addressing "intrastate" telephone use).

Second, the government presented evidence that, for each transaction, the Recorder of Deeds sent copies of the paperwork to the buyer and the seller through the mail, another instrumentality of commerce. *See Little v. United States*, 331 F.2d 287, 292 (8th Cir. 1964). Although Harris used fake addresses, which prevented actual delivery, and did not send anything himself, commercial real-estate documents traveled through the mail each time he recorded a deed, which "affect[ed]" interstate commerce in at least a minor way. 18 U.S.C. § 1028(c)(3)(A); *cf. United States v. Jackson*, 144 F.3d 942, 946–47 (8th Cir. 1998) (holding that a fraudulent document need not cross state lines if the scheme has some effect on interstate commerce).

## III.

Even if nothing was missing from the government's case, Harris believes that the government said too much at closing argument. He failed to object, however, so our review is for plain error. *See United States v. Darden*, 688 F.3d 382, 388–89 (8th Cir. 2012). To prevail, he must identify a "clear or obvious" error that affected his substantial rights. *See id.* at 388 (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)); *United States v. King*, 36 F.3d 728, 734 (8th Cir. 1994) (explaining that it takes "exceptional circumstances" to reverse based on an improper statement made during closing argument).

According to Harris, two of the prosecutor's statements qualify. The first was a reference to the government's "*higher* burden," which explained why it had "the opportunity to split [its closing-argument] time in two." (Emphasis added). Harris had no burden at trial, so he believes the use of the word "higher," a comparative term, left the jury with the mistaken impression that he needed to present evidence

-4-

of his own. *See United States v. Patterson*, 684 F.3d 794, 798 (8th Cir. 2012) (explaining that "the government may not improperly suggest that the defendant has the burden to produce evidence" (citation omitted)).

Even if we assume that the reference was plainly erroneous, it was not prejudicial. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (describing the defendant's burden to show that an error affected his "substantial rights"). The prosecutor's comment was a fleeting reference that immediately followed an accurate statement of the government's burden—proof beyond a reasonable doubt— and the district court repeatedly instructed the jury that the burden was on the government. *See United States v. Golliher*, 820 F.3d 979, 987 (8th Cir. 2016) (examining "the totality of the circumstances" to determine if there was prejudice). There is, in other words, no "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (quotation marks omitted).

The second statement asked the jury to consider what Harris had "done to this community and what he will continue to do to [it] if we do not hold him accountable." In his view, it stoked the passions of the jurors by encouraging them to convict him "in order to protect community values, preserve civil order, [and] deter future lawbreaking." *United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984)) (concluding that this line of argument was off-limits). The government argues that it had a more modest goal in mind: to remind the jury it serves as "the conscience of the community," a perfectly acceptable argument "[u]nless [it is] calculated to inflame." *United States v. Lewis*, 547 F.2d 1030, 1037 (8th Cir. 1976).

The prosecutor's statement did not cross the line here. *See id.* Just after referencing what Harris "will continue to do to this community," she pointed out that he was still receiving rental payments from two of the fraudulently transferred houses. In context, she was asking the jury to make sure Harris could not continue to benefit from the crime he had committed, rather than urging it to "preserve civil

-5-

order[] or deter *future* lawbreaking," *Johnson*, 968 F.2d at 771 (quoting *Monaghan*, 741 F.2d at 1441) (emphasis added).

The line between zealous advocacy and misconduct can sometimes be fuzzy, but we recently concluded that a prosecutor did not go too far when he asked the jury to provide "justice for the community" and "hold [the defendant] accountable." *United States v. Obi*, 25 F.4th 574, 580 (8th Cir. 2022). By urging the jury to reach "a conclusion based on the evidence," *id.* (citation omitted), the prosecutor in this case also steered clear of the line.

IV.

Harris's frustration with the trial extended to the performance of his own lawyer, who failed to locate Carrothers. The question for us is whether "counsel's performance was deficient," and if so, whether prejudice resulted. *O'Neil v. United States*, 966 F.3d 764, 770 (8th Cir. 2020) (citation omitted); *see Strickland v. United States*, 466 U.S. 668, 686 (1984). We review de novo but "strongly presume[]" that counsel acted competently. *McLaughin v. Precythe*, 9 F.4th 819, 827–28 (8th Cir. 2021) (quoting *Strickland*, 466 U.S. at 690).

Harris's ineffective-assistance-of-counsel claim does not make it past step one. Counsel failed to locate Carrothers, but he tried. *See Strickland*, 466 U.S. at 691 (explaining that "counsel has a duty to make reasonable investigations"). Harris initially led him astray by providing the wrong name: "T.J." instead of "J.T." *See Battle v. Delo*, 19 F.3d 1547, 1555 (8th Cir. 1994) (explaining that a lawyer was not ineffective when he tried to find a witness but had the wrong name). Even so, counsel was able to uncover and visit Carrothers's last known address. No one was there, and the consensus from others in the area was that Carrothers had skipped town. At that point, counsel reasonably ended his search. *See Weaver v. United States*, 793 F.3d 857, 864 (8th Cir. 2015) (cautioning against hindsight bias).

The decision to stop looking made sense for another reason: it appeared Carrothers had little to offer. *See McLaughin*, 9 F.4th at 827. Counsel had examined text messages and concluded that there was little chance that he would help Harris's case, much less exonerate him. *See Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (explaining that we should view decisions "from counsel's perspective at the time" (quotation marks omitted)). Under these circumstances, counsel made a "reasonable professional judgment" to direct his efforts elsewhere. *Strickland*, 466 U.S. at 690.

V.

Even though Harris's convictions stand, his 41-month sentence cannot. For identity theft and other property crimes, the recommended sentencing range depends in part on the amount of the "actual" or "intended" losses from the crime. U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A) (taking the greater of the two); *see id*. § 2B1.1(b)(1) (categorizing degrees of loss from a crime). It is a sliding scale: the greater the losses, the larger the enhancement. *See id.* § 2B1.1(b)(1)(A)–(P).

Harris ended up with a total offense level of 22 and a range of 41 to 51 months in prison. Several enhancements played a role, including one for causing $153,000 in actual losses to the owners of the three properties he acquired from Carrothers. U.S.S.G. § 2B1.1(b)(1)(F) (adding ten levels for losses of "[m]ore than $150,000"). The question for us is whether this figure was a "reasonable estimate." U.S.S.G. § 2B1.1 cmt. n.3(C); *see United States v. Hartstein*, 500 F.3d 790, 795 (8th Cir. 2007).

Applying clear-error review, we conclude it was not. *See United States v. Lundstrom*, 880 F.3d 423, 444 (8th Cir. 2018). The district court tried to measure the losses through "[t]he fair market value of the property unlawfully taken." U.S.S.G. § 2B1.1 cmt. n.3(C)(i). Except it used Realtor.com's online valuation tool, which gave a market-value estimate of the three properties *at the time of sentencing*, more than two years after the fraudulent transactions took place, rather than "at the time of" the crimes. *See United States v. Hatchett*, 622 F.3d 984, 987 (8th Cir. 2010)

(citation omitted); *see also United States v. Cedeno*, 471 F.3d 1193, 1195 (11th Cir. 2006) (using "the full fair market value *before* the crime" (emphasis added)).

The mismatch presents a problem because Harris had already renovated each of the homes by then. Although it is unclear from the record how Realtor.com's algorithm works, it is possible that the searches reported a higher market value based on the renovations that Harris completed and paid for himself. What he spent renovating these homes, however, was a loss to *him*, not to the victims. *See United States v. Fazio*, 487 F.3d 646, 658 (8th Cir. 2007) (deducting the value of repairs in calculating the loss).

The government seems unfazed by the possibility that the loss estimates may have been too high. Its view is that non-market factors, like emotional distress, can make up the difference. The only problem is that losses must reflect the "pecuniary harm" suffered by the victims, *excluding* "emotional distress" and "other non-economic harm[s]." U.S.S.G. § 2B1.1 cmt. n.3(A)(i)–(iii); *see United States v. Quevedo*, 654 F.3d 819, 823 (8th Cir. 2011). Adding to the calculation does not work.

What the district court needs to do is subtract. The record reveals that Harris sank tens of thousands of dollars into the three homes he acquired from Carrothers. And yet, dropping the loss estimate a little, from $153,000 to $150,000, would have reduced his total offense level by two and lowered the range by nearly 20%, from 41 to 51 months to 33 to 41 months in prison. *See* U.S.S.G. § 2B1.1(b)(1)(E); *cf. United States v. McGrew*, 846 F.3d 277, 280 (8th Cir. 2017) (explaining that a Guidelines error is harmless unless it "substantially influence[s]" the sentence). On remand, we instruct the court to adopt "a reasonable estimate of the" fair market value at the time of the transfer, either by using a measure that reflects the value at that point or by accounting for Harris's post-fraud improvements and market changes during the intervening period. *See Hatchett*, 622 F.3d at 987.

## VI.

We accordingly affirm in part, reverse in part, and remand for resentencing.

_____