# United States Court of Appeals

## For the Eighth Circuit

_____

No. 24-1603

_____

United States of America

*Plaintiff - Appellee*

v.

John Nock

*Defendant - Appellant*

_____

No. 24-1713

_____

United States of America

*Plaintiff - Appellee*

v.

Brian Brittsan

*Defendant - Appellant*

_____

No. 24-1714

_____

United States of America

*Plaintiff - Appellee*

v.

Kevin Griffith

*Defendant - Appellant*
_____

Appeals from United States District Court
for the Western District of Arkansas - Fayetteville
_____

Submitted: June 10, 2025
Filed: August 7, 2025
_____

Before COLLOTON, Chief Judge, ARNOLD and GRUENDER, Circuit Judges.
_____

ARNOLD, Circuit Judge.

A jury found John Nock, Brian Brittsan, and Kevin Griffith guilty of several counts of conspiracy and wire fraud stemming from their participation in an investment scheme, and the district court[1] sentenced each of them to a decade or more in prison. On appeal, they challenge several aspects of their convictions and sentences. Finding none of their challenges persuasive, we affirm.

According to the indictment, the three defendants carried out their scheme through a purported investment firm known as The Brittingham Group, which we will call "Brittingham." Nock and Brittsan were alleged to have solicited investors to give Brittingham large sums of money, and in return, they assured the investors that they would receive large returns quickly. For example, the indictment notes that Nock and

_____

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

-2-

Brittsan promised returns reaching "as much as 200 percent or 300 percent within 20 to 30 days." The indictment explains several ways in which the defendants misled investors, as, for instance, by misrepresenting that Brittingham's office was located on Wall Street, that Brittingham was pursuing legitimate investments, that Brittingham had a history of successful investments, and that the investors' money was not at risk. One way they convinced investors that their money was not at risk was by giving them "fraudulent letters on third-party letterhead, including the letterhead of financial institutions." Once Nock and Brittsan convinced investors to part with their money, the indictment continues, they would direct the investors to send money to accounts that others in the scheme like Griffith controlled, and they "then transferred the money through a complex web of bank accounts throughout the world."

Investors understandably asked questions once they didn't receive the money they expected, and when they did, the indictment says that the defendants worked together "to craft the stories that they told the victims in order to conceal the fraudulent nature of the scheme." The defendants allegedly collaborated in drafting misleading communications offering excuses why investors hadn't received what was promised, and they even sometimes falsely claimed that high-level government officials were involved in delaying transactions or in guaranteeing that money would be safely returned to investors. None of the investors, however, ever received any investment gains, and most never saw the return of their contributions. All told, the defendants allegedly obtained more than sixteen million dollars from investors. As a result, each defendant was charged with conspiracy to commit wire fraud, *see* 18 U.S.C. § 1349, nine counts of wire fraud, *see id.* § 1343, and conspiracy to commit money laundering, *see id.* § 1956(h). Nock was also charged with an additional count of money laundering, *see id.* § 1957, and the government sought forfeiture of proceeds derived from the scheme.

Less than two months before trial was scheduled to begin, Nock asked the district court to remove his appointed counsel, Ken Osborne, and permit Nock to obtain another attorney. He also asked the court to afford his new attorney time to review the case and develop a defense. Nock advised that Osborne had not communicated with him much despite the upcoming trial, and he complained that Osborne had not provided or reviewed with him what Nock called "massive document sets" even though Nock believed this to be a complex case. So Nock surmised that Osborne had not spent the time necessary to understand the case or develop an adequate defense.

Osborne responded the next day and said that he had "reviewed an enormous amount of discovery" and had met with counsel for the other defendants three times to prepare a joint defense. He explained that he had met with Nock a few weeks before and that he had never prevented Nock from visiting his office. In fact, Osborne related, he had tried to schedule three additional appointments with Nock the week before Nock's request to substitute counsel but that Nock had "chosen to miss" them. Osborne also advised that, once the government provided witness and exhibit lists in the coming days, he was going to "step up our meetings on a significant basis." In short, Osborne assured the court "[t]hat in spite of the voluminous discovery, this case is straightforward and as counsel for Mr. Nock I am fully prepared to try it."

The district court referred Nock's request to a magistrate judge[2] who conducted an extensive hearing where Osborne and Nock reiterated their positions on the matter. The magistrate judge ultimately denied Nock's request. She told Nock that "it cannot be laid solely at the feet of Mr. Osborne that you and he have not gotten together" as much as Nock would have liked. It also appeared to her that Osborne had been working on the case by "meeting with counsel, talking to the government, reviewing

---

[2]The Honorable Christy D. Comstock, Chief Magistrate Judge for the Western District of Arkansas.

discovery, those sorts of things." The magistrate judge also noted that in her experience "Osborne is an effective counselor," particularly in criminal cases, who is "experience[d]," "smart," and "canny," and she recognized that she had "to keep the train on the tracks and to prevent delay." Believing that Nock and Osborne were "on the cusp" of "rolling up [their] sleeves" to prepare for trial, she told Nock that he had "the right counsel to be ready for trial," though she invited him to renew his request for new counsel if the circumstances changed. He didn't do so again until after trial.

On appeal, Nock maintains that the magistrate judge should have granted his request because he demonstrated justifiable dissatisfaction with Osborne. The Sixth Amendment guarantees a criminal defendant the right to the assistance of counsel. *See United States v. Baisden*, 713 F.3d 450, 454 (8th Cir. 2013). To be entitled to different counsel after one has been appointed, a defendant must demonstrate "justifiable dissatisfaction" with appointed counsel. *See id.* It is not enough that the defendant is frustrated with counsel for not sharing his tactical opinions so long as counsel continues to provide zealous representation. *See id.* A court facing a motion for new counsel must weigh several concerns, including "the need to ensure effective legal representation, the need to thwart abusive delay tactics, and the reality that a person accused of crime is often genuinely unhappy with an appointed counsel who is nonetheless doing a good job." *See United States v. Barrow*, 287 F.3d 733, 738 (8th Cir. 2002).

Nock's challenge arguably stumbles out of the gate because he failed to object to the magistrate judge's denial of his request. Nock had fourteen days to object to the magistrate judge's decision, and by failing to do so, he waived his right to seek review in our court. *See* Fed. R. Crim. P. 59(a). We have said, though, that Rule 59(a) is a "nonjurisdictional waiver provision" and that we may excuse violations of the rule in the interests of justice, *see United States v. Kelley*, 774 F.3d 434, 439 (8th Cir. 2014), which Nock encourages us to do here. But even if we agreed with Nock that the

interests of justice excuse his failure to object, Nock would not prevail because the magistrate judge committed no abuse of discretion here.

"Whether to grant a continuance and substitution of counsel is a matter committed to the sound discretion of the district court." *United States v. Harlan*, 960 F.3d 1089, 1091 (8th Cir. 2020). In fact, the district court's "discretion is at its zenith" when a defendant seeks to replace counsel shortly before trial. *See United States v. Cordy*, 560 F.3d 808, 817 (8th Cir. 2009). Though there's no indication here that Nock's request was a delay tactic, he did suggest that delay would result so his new attorney could get up to speed.

The magistrate judge acted within her ample discretion in determining that Nock hadn't demonstrated justifiable dissatisfaction with Osborne. There was no irreconcilable conflict or complete breakdown in communication. Nock and Osborne might have shared different opinions about the time needed for Osborne to digest the case and formulate a defense, but this seems to reflect "the reality that a person accused of crime is often genuinely unhappy with an appointed counsel who is nonetheless doing a good job." *See Barrow*, 287 F.3d at 738. The magistrate judge was also familiar with Osborne's record as an attorney and believed that he was the right person for the job notwithstanding Nock's concerns. Telling too is that Nock didn't renew his request for new counsel before trial began, as he was invited to do if the circumstances suggested that Osborne was not in fact rolling up his sleeves to prepare for trial. We see no reason to second-guess the magistrate judge's decision.

In a related contention, Nock says that Osborne rendered ineffective assistance both before and during trial. As he acknowledges, though, claims of ineffective assistance of counsel "are usually best litigated in collateral proceedings." *See United States v. Ramirez-Hernandez,* 449 F.3d 824, 826–27 (8th Cir. 2006). Review on direct appeal is appropriate "only where the record has been fully developed, where not to act would amount to a plain miscarriage of justice, or where counsel's error is readily

apparent." *See id.* at 827. This case presents none of these circumstances, *cf. United States v. Harriman*, 970 F.3d 1048, 1060–61 (8th Cir. 2020), and so we decline to consider his ineffective-assistance arguments.

For his next challenge, Nock says that the government's lead investigator, Nathaniel Nantze, offered improper testimony during the trial. We ordinarily review a district court's evidentiary rulings for an abuse of discretion, but since Nock did not timely object to the relevant portions of Nantze's testimony, we review those rulings only for plain error. *See United States v. Broussard*, 87 F.4th 376, 379 (8th Cir. 2023). To overcome this high standard, Nock must show that there was a clear and obvious error that affected his substantial rights and seriously affected the fairness, integrity, or public reputation of the proceedings. *See id.*

Nock takes issue with several aspects of Nantze's testimony, but after reviewing the relevant portions of the trial transcript ourselves, we think Nock's characterizations of Nantze's testimony are more rhetoric than reality. For example, Nock says that Nantze impermissibly told the jury to find him and his co-defendants guilty. In support, Nock points out that Nantze referred a few times to three unindicted people as "co-conspirators" who worked on investments with Brittingham. But Nantze never said that these unindicted people were conspiring with Nock. And his comments were actually consistent with Nock's theory of the case. Nock didn't dispute that investors were cheated out of money; rather, he argued that others had duped both him and the investors. To borrow the more colorful language used in Nock's opening statement at trial, the three defendants "went swimming with sharks and they got bit." Nantze's infrequent mention of co-conspirators being involved reflected at most a view (shared by Nock) that nefarious actors had tricked investors. For much the same reason we see little harm in Nantze occasionally referring to some investors as "victims." At no time did he say that the investors were victims of Nock or any other defendant. Nantze's incidental references to the "victims" of fraud in the circumstances cannot be said to have affected Nock's substantial rights, even

assuming they amounted to plain error in the first place. *See United States v. Alaboudi*, 786 F.3d 1136, 1143–44 (8th Cir. 2015).

Nock also takes aim at Nantze's use of terms like "supposed" or "purported" when describing Nock's representations or documentary evidence. For example, Nock says that Nantze testified that a document reflected that Nock "supposedly" owned funds, or that bank letters "purported" to be genuine. Nock asserts that these terms suggested that the jury should believe the government's witnesses. Most if not all uses of these terms actually occurred during the government's questions and not Nantze's responses, but regardless, we discern no plain error. Given that Nantze was familiar with the case, he almost certainly knew that the jury would be called on to resolve particular issues such as whether certain documents were fake. His stating or affirming what documents purported to show is neutral as to whether the jury should find them fake or not. As the government explained, these terms "signal only that the witness cannot independently vouch for the accuracy or authenticity of an exhibit or representation; they do not state an opinion on any necessary determination by the jury."

According to Nock, Nantze also interpreted legal agreements between Brittingham and the investors and, when he did, "he ignored other caveats in the agreements." For one thing, we think Nock's characterization of Nantze's testimony is a stretch. For another, Nock was free to cross examine Nantze regarding portions of the agreements that he wished to highlight. We see no plain error here.

The final evidentiary challenge we will address specifically is Nock's contention that Nantze was improperly permitted to summarize emails and testify to what he believed they illustrated. It is true that our court has "been skeptical of lay testimony from law enforcement officers 'interpreting' evidence." *See United States v. Dierks*, 978 F.3d 585, 592 (8th Cir. 2020) (citing *United States v. Peoples*, 250 F.3d 630 (8th Cir. 2001)). In *Peoples*, an officer in charge of investigating a murder

testified about recorded conversations involving the defendants. *See* 250 F.3d at 639–40. The officer offered her opinion about the meaning of words the defendants used, and she opined "about what the defendants were thinking during the conversations, phrased as contentions supporting her conclusion, repeated throughout her testimony, that the defendants were responsible for [the victim's] murder." *See id.* at 640. And over objections by the defendants, the officer "was allowed to offer a narrative gloss that consisted almost entirely of her personal opinions of what the conversations meant." *See id.* The opinion highlighted examples of testimony where the officer heard snippets of the recorded conversations and provided her own interpretation of what the defendants' conversations meant, even prefacing her interpretations with phrases like "I contend" or "I believe." *See id.* Troubled by this narrative gloss, our court reversed the defendants' convictions and remanded for a new trial. *See id.* at 642.

Nantze offered little if any "narrative gloss" here. The government used Nantze's testimony to walk the jury through a factually complex case, and much of his testimony consisted simply of him reading documentary evidence. Nock has identified no instances where Nantze began his responses by stating that he "believes" or "contends" that emails actually meant something other than what their plain language suggests. We acknowledge, though, that Nock has raised a few potentially troublesome points. For example, during the trial Nantze said that Nock sent money to someone, and when the government asked what happened about a week later, Nantze said that Nock sent the person "lulling language" without additional explanation. That arguably could be an impermissible narrative gloss. But our scant caselaw on the subject does not clearly delineate the line between proper lay witness testimony and improper "narrative gloss," so any error here with respect to Nantze's use of "lulling language" or the other borderline calls that Nock identifies was not plain. It was up to Nock and his attorney to identify for the district court any encroachments by the government and Nantze into impermissible territory. In our adversarial system, we do not expect district courts to correct witnesses sua sponte

for crossing indistinct lines when three separate defendants (and still two on appeal) are content to let the witness's testimony stand uncorrected. As stated in a recent case presenting a similar challenge, it is "plainly without merit" that "the district court was obligated *sua sponte* to interrupt and strike testimony to which there was no objection." *See United States v. Williams*, 41 F.4th 979, 984 (8th Cir. 2022). A reversal in the circumstances would encourage defendants to lie in wait rather than bring their concerns to the district court's attention for immediate correction.

But not only were any errors not plain, they alone or in the aggregate had no effect on Nock's substantial rights. The existence of a few sporadic and fleeting comments about relatively incidental matters over the course of a nine-day trial is not enough to call the jury's verdict into doubt. And in most if not all instances, the members of the jury could consider the materials Nantze testified about for themselves, as he wasn't discussing matters not admitted into evidence, *see United States v. Garth*, 540 F.3d 766, 778–79 (8th Cir. 2008), *abrogation on other grounds recognized by*, *United States v. Villareal-Amarillas*, 562 F.3d 892, 895 (8th Cir. 2009), or interpreting coded language that the jury might not understand. *See Dierks*, 978 F.3d at 592–93; *cf. Peoples*, 250 F.3d at 640. We thus reject Nock's various contentions about Nantze's testimony.

Nock also challenges the sentence that the court imposed, but we will turn first to Brittsan's and Griffith's arguments that the evidence at trial was insufficient to convict them. The government contends that neither of them preserved their contentions for appellate review, but for purposes of this opinion we will assume that they did. We review their challenges de novo, viewing the evidence in a light most favorable to the jury's verdict. *See United States v. Keck*, 2 F.4th 1085, 1090 (8th Cir. 2021). We will overturn a conviction only if no reasonable jury could have found the defendants guilty beyond a reasonable doubt. *See id.*

Brittsan and Griffith both argue that, even if others had entered into an unlawful conspiracy, there was insufficient evidence to suggest that they had joined it. To convict Brittsan and Griffith of conspiracy, the government had to prove that a conspiracy with an illegal purpose existed, that the defendants knew of the conspiracy's purpose, and that they knowingly and voluntarily agreed to participate in the conspiracy. *See United States v. King*, 898 F.3d 797, 808 (8th Cir. 2018). The government need not show that an explicit agreement existed; a tacit or implied understanding will suffice. *See id.* And even if the defendant held only a minor role in the conspiracy, his conviction will be upheld. *See id.*

The government presented ample evidence from which a jury could find beyond a reasonable doubt that Brittsan knowingly and intentionally joined an unlawful conspiracy. Numerous investors testified that Brittsan made them promises of quick, fanciful returns with virtually zero risk. At one point he even falsely represented having access to a Boeing 747 that could pick up over one hundred tons of gold. A jury could infer from such outlandish promises that Brittsan intended to participate in a conspiracy to defraud. *See Stromberger v. 3M Co.*, 990 F.2d 974, 978 (7th Cir. 1993). Some investors also testified that Brittsan had represented that Brittingham had a record of investment success, though later while testifying under oath in a civil proceeding Brittsan admitted that Brittingham had never completed a single transaction or ever obtained any returns for a client. He even told law enforcement at one point that one type of investment that Brittingham promised investors it would pursue was actually "a 99 percent bullshit industry" and that Brittingham "was grabbing after rainbows." Yet he represented Brittingham for years. The record also showed that Brittsan sent investors fake letters from banks and others to ease their concerns about their money, and some evidence suggested that Brittsan prepared the fake letters himself. Brittsan's argument that the evidence against him was insufficient is untenable.

The evidence against Griffith presents a closer call, but we nonetheless hold that a reasonable jury could find beyond a reasonable doubt that he knowingly and intentionally participated in an unlawful conspiracy. Griffith emphasizes that he had little interaction with Brittingham's investors and otherwise had only limited involvement with Brittingham, suggesting that he didn't know Brittingham had any unlawful objectives and that he didn't intend to commit fraud.

The government nonetheless introduced sufficient evidence to implicate Griffith. It introduced evidence that Griffith helped Nock draft a fake bank record to make it appear authentic. It also introduced evidence that Griffith forwarded fake bank letters to others. For example, the government introduced an email from Griffith to one Elysa Smith that contained a letter purporting to be from the Royal Bank of Scotland representing that an account contained one hundred million euros with five million dollars set aside as security for a potential investment. Representatives from the Royal Bank of Scotland testified that the letter was fake. Griffith argues that the government didn't show that Smith was a victim. In fact, says Griffith, he identified Smith as a member of his "team" when he took the stand in his own defense. The jury did not have to buy this, though, as the contents of the email suggest that Griffith was attempting to induce someone to part with money in reliance on a fake letter, whether it was Smith herself or someone that Smith might reach on Griffith's behalf. In the exchange between Griffith and Smith, Griffith wrote, "You can opt to do this transaction with either 2.5M or 5M," and he said that the purported bank statement "will clearly state that the larger amount is fully protected." He went on to say in all capital letters that the letter offered "full protection for this investment," making it "completely secure with no risk and only upside."

Griffith testified (and continues to assert on appeal) that he didn't know at the time that the letter was fake. But again, the jury did not have to believe him. Griffith sent the email at a time when he was already on notice that Brittingham might be trading in fake letters from the Royal Bank of Scotland. An unindicted participant in

the conspiracy to whom the defendants sought to shift blame told Nock and Griffith a couple years earlier that the Royal Bank of Scotland was accusing them of fraud and "are really pissed [and] want to take all of us out." Just two weeks after Griffith received that communication, he nonetheless asked that person to provide him with a new bank statement from the Royal Bank of Scotland signed by two bank officers. That person provided the statement, purportedly signed by two bank CEOs, just eleven minutes later. The statement purported to show that an account contained thirty billion euros. A jury could reasonably reject Griffith's assertions of innocence and find from the circumstances that he knew the statements were fake, or at least that he was wilfully blind to whether they were fake or not. *See United States v. Hansen*, 791 F.3d 863, 868 (8th Cir. 2015).

Other evidence implicated Griffith as well. Some showed that Griffith, like Brittsan, vouched for a track record of success that didn't exist. He told concerned investors who pointed out that Brittingham was involved in a civil Racketeer Influenced and Corrupt Organizations suit that Nock "has been a very high send [sic] security trader inside the US for decades" and a "trusted trader with net worth in the hundreds of millions." And when those investors mentioned that the Wall Street address was just a virtual office (which was true), Griffith disputed the allegation and stated that Nock had had the address for "many years." Griffith admitted on the stand, however, that he knew there was no physical office and that he was told it was only a virtual office. Griffith would go on to vouch for Nock again just a few months after warning Nock that he was at serious risk of criminal charges and at a time when Griffith says he began to grow concerned about Brittingham. Griffith nonetheless assuaged investor concerns about Nock by saying that he and Nock "had numerous business transactions which have all been successful and highly professional," among other plaudits. A reasonable jury could conclude that Griffith was knowingly participating in a conspiracy.

Griffith highlights some evidence that favors him. For example, he points to emails he sent Nock in which he expressed concern that an unindicted participant in the conspiracy might be causing financial harm to a particular investor thanks to the "repeated misinformation" he had been providing. Griffith tells us (and told the jury) that, if he had entered into a conspiracy with Nock, then "these emails make absolutely no sense." But once again, the jury wasn't compelled to accept Griffith's story. The jury could believe that by this point Griffith feared getting caught and so was leaving a paper trail to cover his tracks. Or perhaps Griffith didn't want the conspiracy's tentacles to ensnare a particular customer.

We are mindful that Griffith took the stand to assert his innocence, yet "the jury, being the sole judges of the credibility of all testimony, was not bound to believe this testimony and manifestly did not believe it, but from all the proven facts and circumstances found that the defendant acted fraudulently." *See Northcraft v. United States*, 271 F.2d 184, 187 (8th Cir. 1959). In sum, Griffith's contention that the evidence was insufficient to support his conviction fails.

We now turn to the defendants' challenges to their sentences, beginning with Nock. He maintains that the district court erred in sentencing him to 250 months in prison because it miscalculated his recommended sentencing range under the Sentencing Guidelines in two different ways. The first way, he says, is when the court added two levels to his offense level by relying on the loss Nock intended to cause rather than the loss he actually caused. *See* USSG § 2B1.1(b)(K)–(L). The Guidelines in effect at the time Nock was sentenced contained commentary that said that "loss is the greater of actual loss or intended loss." *See id.* § 2B1.1 cmt. n. 3(A) (2023). The Supreme Court has called on courts to defer to Guidelines commentary, *see Stinson v. United States*, 508 U.S. 36, 47 (1993), and indeed our court has applied the very commentary at issue here. *See, e.g.*, *United States v. Holthaus*, 486 F.3d 451, 454 (8th Cir. 2007). But Nock insists that the legal landscape surrounding deference to Guidelines commentary changed after the Supreme Court decided *Kisor v. Wilkie*,

588 U.S. 558 (2019), and he says courts should no longer follow the commentary here. At least one circuit agrees. *See United States v. Banks*, 55 F.4th 246, 255–58 (3d Cir. 2022). *But see United States v. Hackett*, 123 F.4th 1005, 1013–15 (9th Cir. 2024).

Our court has explained, however, that even after *Kisor* we consider the Guidelines together with their commentary, and a "lawfully adopted, noncontradictory comment or application note that interprets or explains a Guideline will be given controlling weight unless plainly erroneous." *See United States v. Donath*, 107 F.4th 830, 838 (8th Cir. 2024); *see also United States v. Cupples*, 105 F.4th 1096, 1097–98 (8th Cir. 2024) (per curiam) (citing *United States v. Rivera*, 76 F.4th 1085, 1091 (8th Cir. 2023)). Our court, moreover, has applied the commentary directing courts to use the greater of actual loss and intended loss even after *Kisor*. *See, e.g.*, *United States v. Harris*, 83 F.4th 1093, 1098 (8th Cir. 2023); *United States v. Ruzicka*, 988 F.3d 997, 1012 (8th Cir. 2021). Precedent therefore forecloses Nock's contention.

The second way in which the court supposedly miscalculated Nock's sentencing range is by applying a two-level enhancement for abuse of trust. According to the relevant Guideline, the enhancement applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." *See* USSG § 3B1.3. Applying this enhancement is "not a simple task," as "there is a component of misplaced trust inherent in the concept of fraud." *See United States v. Hayes*, 574 F.3d 460, 479 (8th Cir. 2009). The enhancement therefore doesn't apply in every fraud case; it applies when "the victim placed a special trust in the defendant beyond the ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario." *See id.* As the commentary to the relevant Guideline explains, the enhancement applies where the fraudster has "professional or managerial discretion" because he is "subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *See* USSG § 3B1.3 cmt.

-15-

n. 1. So the enhancement would apply to "a bank executive's fraudulent loan scheme," but not to "embezzlement or theft by an ordinary bank teller." *See id.*

We've affirmed application of the enhancement in cases similar to this one. For example, in one case, we upheld it where a self-employed investment advisor subject only to his investors' oversight swindled them out of money after promising to make them sizable profits safely, only to keep the money himself. *See United States v. Rodd*, 790 F.3d 873, 874–75 (8th Cir. 2015). In another, a defendant solicited investments in his company with promises of a risk-free annual return but instead diverted their investments for his personal use. *See United States v. Anderson*, 349 F.3d 568, 570 (8th Cir. 2003). Given that the defendant exercised complete discretion over the investors' money, the enhancement was upheld. *See id.* at 573–74. We discern no basis to distinguish those cases from Nock's, and even though the district court relied on them in applying the enhancement, Nock does not attempt to distinguish them.

Nock also points out that the enhancement by its terms does not apply "if an abuse of trust or skill is included in the base offense level or specific offense characteristic." *See* USSG § 3B1.3. But as just explained, not every fraud involves an abuse of trust like the one the Guidelines contemplate, and nothing in Nock's Guidelines calculation already accounted for the abuse of trust; so this feature of Nock's offense was not double counted for purposes of punishment. *See United States v. Laurienti*, 611 F.3d 530, 555–56 (9th Cir. 2010). The district court properly applied the enhancement.

Returning to Brittsan and Griffith, they each argue that their sentence is substantively unreasonable. Brittsan received a 120-month sentence, though the Guidelines recommended a sentence between 168 to 210 months. He maintains that the district court didn't give enough weight to his lack of criminal history, age, or poor health, and he says that his sentence is longer than the average of what similarly

situated defendants have received. We see no abuse of discretion here. The district court identified and considered the relevant sentencing criteria and discussed several mitigating circumstances at sentencing, including those Brittsan alludes to. He also neglects to mention that his sentence is the median sentence according to the statistics that he identifies. But more important, his sentence was considerably lower than the sentence that the Guidelines recommended for his particular circumstances. "Where the district court varied downward from the guidelines range, it is nearly inconceivable that the court abused its discretion in not varying downward still further." *United States v. Matheny*, 42 F.4th 837, 846–47 (8th Cir. 2022).

For Griffith, meanwhile, the Guidelines recommended a sentence of 135 to 168 months in prison, and the district court sentenced him to 150 months, or just below the midpoint of the recommended range. A sentence within the Guidelines range is presumptively reasonable. *United States v. McDaniel*, 59 F.4th 975, 982 (8th Cir. 2023). He too argues that the district court gave too little weight to his age, health, and lack of criminal history. But as in Brittsan's sentencing hearing, the district court carefully considered the relevant sentencing criteria and specifically took into account the mitigating circumstances that Griffith identifies.

Griffith also points out that his sentence is well above the average and median sentences of similarly situated defendants, but those bare statistics don't account for the unique circumstances that Griffith presents. He also questions why he received a higher sentence than Brittsan. But Griffith's and Brittsan's circumstances were different. Griffith violated a court order while on pretrial release by sending money overseas that might have otherwise been used to compensate victims here. The court deemed his "lack of respect for the law in violating the Court's orders" as aggravating. Griffith has simply failed to overcome the presumption that his within-Guidelines sentence is reasonable.

Finally, Griffith challenges a court order requiring him to forfeit $86,500. *See* 18 U.S.C. § 982(a). That total represents the sum of a $50,000 payment from Nock and a $36,500 payment from one Willah Mudolo. Griffith says that he returned both amounts, and so he shouldn't be ordered to pay them again. In his opening brief, Griffith dedicated one sentence to his alleged return of Nock's money, stating without citation to the record that he gave the money back either by returning it or by distributing it as Nock directed. By failing to provide a meaningful argument in his opening brief on this point, Griffith waived his contention. *See Chavero-Linares v. Smith*, 782 F.3d 1038, 1040 (8th Cir. 2015).

As for Mudolo, Griffith says that he gave Mudolo $100,000. But Griffith never demonstrated that this money was meant to return money, or in fact did return money, to victims. According to defense counsel, Griffith sent Mudolo this money for purposes of investment, not to pay down Griffith's debts to victims of the conspiracy.

Griffith also says that Mudolo wasn't a victim in the case, and nothing indicates that the money Mudolo sent him was derived from illegal activity. It is true that the court at Griffith's sentencing remarked that Mudolo's role in the conspiracy was unclear, though as the government explains, he appeared either to be a co-conspirator or at least "an unwitting patsy" that the conspirators used to entice victims and obtain additional money. For example, the government introduced into evidence an email from Griffith to Mudolo containing a letter that Griffith drafted for Mudolo to forward that touted Brittingham's success and the safety of the investor's money. And when Griffith received money from Mudolo, he plugged it into a pipeline of accounts that masked its location, and it ultimately led to $36,500 in cash withdrawals by Griffith. The district court did not clearly err in finding that the money from Mudolo represented proceeds from the conspiracy.

Affirmed.

_____

-18-